# Exhibit A

Sheriff Number: 22031695    Court Case Number: 22-A-08425-2

Date Received: 10/5/2022 Time: 2:43 PM

Special Service Inst:

State of Georgia

Gwinnett County

ATTORNEY'S ADDRESS

VIORICA BUDEANU AND GV AGENCY INC

PLAINTIFF

VS.

ALLSTATE INSURANCE COMPANY

DEFENDANT

NAME AND ADDRESS OF PARTY TO BE SERVED

ALLSTATE INSURANCE CO
289 SOUTH CULVER STREET
LAWRENCEVILLE, GA 30046

### SHERIFF'S ENTRY OF SERVICE

**PERSONAL** ☐    Sex_____ Skin Color_____ Hair Color_____ Age_____ Hgt_____ Wgt_____

I have this day served the defendant _____ personally with a copy of the within action and summons.

**NOTORIOUS** ☐

I have this day served the defendant _____ by leaving a copy of the action and

summons at his most notorious place in this County.

Delivered same into the hands of _____ described as follows:

| SEX | SKIN COLOR | HAIR COLOR | AGE | HGT | WGT |
|---|---|---|---|---|---|
|  |  |  |  |  |  |

**CORPORATION** ☑

I have this day served the _____ a corporation by leaving a copy of

the within action and summons with _____ in charge of the office and place of

doing business of said Corporation in this County.

**TACK AND MAIL** ☐

I have this day served the above styled affidavit and summons on the defendant(s) by posting a copy of the same to the door of the premises designated in said affidavit, and on the same day of such posting by depositing a true copy of same in the United States Mail, First Class in an envelope properly addressed to the defendant at the address shown in said summons, with adequate postage affixed thereon containing notice to the defendant(s) to answer said summons at the place stated in the summons.

**NON EST** ☐

Diligent search made and defendant _____ not to be found

in the jurisdiction of this Court.

**SPECIAL PROCESS**

**COMMENTS**

Date:_____

Time:_____

_____

Deputy Sheriff

_____

GWINNETT COUNTY GEORGIA

E-FILED IN OFFICE - LW
CLERK OF SUPERIOR COURT
GWINNETT COUNTY, GEORGIA
22-A-08425-2
9/28/2022 10:29 AM
TIANA P. GARNER, CLERK

IN THE SUPERIOR COURT OF GWINNETT COUNTY

STATE OF GEORGIA

**Viorica Budeanu and**

**GV Agency, Inc.,**

CIVIL ACTION
NUMBER: **22-A-08425-2**

PLAINTIFF

VS.

**Allstate Insurance Company,**

DEFENDANT

## SUMMONS

**TO THE ABOVE NAMED DEFENDANT:**

You are hereby summoned and required to file with the Clerk of said court and serve upon the Plaintiff's attorney, whose name and address is:

**Cary Ichter, Esq. - Ichter Davis LLC**
**400 Interstate North Pkwy SE, Suite 860**
**Atlanta, Georgia 30339**

an answer to the complaint which is herewith served upon you, within 30 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

This _____ day of _____, 20_____.
28th day of September, 2022

Tiana P. Garner
Clerk of Superior Court

_____
Deputy Clerk

INSTRUCTIONS: Attach addendum sheet for additional parties if needed, make notation on this sheet if addendum sheet is used.

SC-1 Rev. 2011

E-FILED IN OFFICE - JM
CLERK OF SUPERIOR COURT
GWINNETT COUNTY, GEORGIA
22-A-08425-2
9/27/2022 8:12 PM
TIANA P. GARNER, CLERK

IN THE SUPERIOR COURT OF GWINNETT COUNTY
STATE OF GEORGIA

| | |
|---|---|
| VIORICA BUDEANU and GV AGENCY, INC., | ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) |
| ALLSTATE INSURANCE COMPANY, | ) ) ) |
| Defendant. | ) ) ) |

Civil Action File No.: _22-A-08425-2_____

JURY TRIAL DEMANDED

## COMPLAINT

COME NOW, Plaintiffs Viorica Budeanu ("Ms. Budeanu") and GV Agency, Inc. ("GV" and with Ms. Budeanu collectively, "Plaintiffs") and file this Complaint against Defendant Allstate Insurance Company ("Allstate" or "Defendant"), showing the Court as follows:

## PARTIES

1.     Ms. Budeanu is currently a Georgia resident and was a Georgia resident at all times relevant to this Complaint.

2.     GV is a Georgia corporation, and Ms. Budeanu is the CEO of GV.

3.     Defendant Allstate Insurance Company is an Illinois corporation that is authorized to and does transact business in Georgia. It may be served with process by delivering the Summons and this Complaint to its registered agent, CT Corporation System at 289 South Culver Street, Lawrenceville, Gwinnett County, Georgia 30046.

4.     At all times relevant to this Complaint, Allstate derived profits from business activities in Georgia and purposefully availed itself of the privileges and benefits of conducting business in Georgia. Further, Allstate maintains a registered office and

registered agent in Georgia and has active websites accessible in Georgia where it engages in the direct promotion of its business.

**JURISDICTION AND VENUE**

5.       This Court has jurisdiction over the parties and the subject matter of this lawsuit pursuant to O.C.G.A. § 9-10-91.

6.       The venue of this action is proper in Gwinnett County, Georgia, pursuant to O.C.G.A. § 14-2-510(b)(1) because Allstate maintains its registered office in Gwinnett County, Georgia.

**FACTS**

**A. Ms. Budeanu's Contract with AllState**

7.       On or about June 1, 2016, Allstate and Ms. Budeanu entered into the Allstate R3001S Exclusive Agency Agreement (the "Agency Agreement"). A true and correct copy of the Agency Agreement is attached hereto as **Exhibit 1**.

8.       Pursuant to the Agency Agreement, Ms. Budeanu was an Allstate Exclusive Agent ("EA") who owned and operated an Allstate agency, GV Agency, Inc. ("GV"), in DeKalb County, Georgia.

9.       Like all other EAs who executed an Allstate R3001S Exclusive Agency Agreement, as an EA under the Agency Agreement, Ms. Budeanu was an independent contractor of Allstate and was authorized to sell insurance policies on behalf of Allstate. In exchange for her sale of insurance policies, Ms. Budeanu was entitled to commissions and the ability to build a valuable book of business.

10.     Except for very limited circumstances, the Agency Agreement prohibited Ms. Budeanu from selling insurance policies of other insurance companies.

11.     As part of her execution of the Agency Agreement, Ms. Budeanu, like all other EAs, was required by Allstate to agree to the terms of additional documents referenced and incorporated into the Agency Agreement. These documents included the Exclusive Agency Independent Contractor Manual (the "Manual"), the Supplement for the R3001 Agreement (the "Supplement"), and the Allstate Agency Standards ("Agency Standards"). The Agency Agreement, Manual, Supplement, and Agency Standards are hereinafter collectively referred to as the "EA Contract."

12.     Under the terms of the EA Contract, Ms. Budeanu was an independent contractor who maintained the authority to act on behalf of Allstate or enter any binding contract on behalf of Allstate only "for contracts of insurance or other contracts as expressly authorized by this Agreement." (Ex. 1 at p. 1 § D.)

13.     Further, under the EA Contract, Ms. Budeanu held an economic interest in the book of business created pursuant to her relationship with Allstate. As such, whenever Ms. Budeanu sold an Allstate insurance policy, the value of that policy became part of her book of business.

14.     Under the express terms of the EA Contract, Ms. Budeanu's economic interest in the book of business included her right to sell her economic interest to an approved buyer or to receive a termination payment from Allstate.

15.     Furthermore, under the EA Contract, if the Agency Agreement was terminated, Ms. Budeanu would have 90 days to obtain a buyer who had to be approved by Allstate, reach an agreement, and close the sale with said buyer. If, after termination,

Ms. Budeanu failed to close the sale within that 90-day timeframe, she would receive a termination payment that would likely be less than 50% of the value of her book of business.

16.    Despite the discretion the EA Contract granted Allstate to approve a sale of her book of business, the contract also states that Allstate's involvement in any such sale is limited solely to approving or denying the sale.

17.    Indeed, the Manual (part of the EA Contract) states in relevant part: "In sale of agency situations, Allstate is never the buyer or seller. The only times Allstate is involved is to approve the buyer and when you elect to receive the termination payment."

18.    The express terms of the EA Contract also allow for and contemplate an EA, such as Ms. Budeanu, qualifying as an approved buyer of another EA's book of business.

19.    Although an EA who seeks to purchase another EA's book of business must be approved by Allstate, such approval under the contract is based on objective criteria as to whether the purchasing EA is qualified.

20.    These objective criteria are stringent such that most EAs never meet such qualifications and are, thus, effectively disqualified from purchasing a book of business despite Allstate's purported policy allowing the purchase of a book of business by another EA.

21.    Further, Plaintiffs allege upon information and belief that Allstate made known to its agents that it would refuse to consider almost any sale of a book of business to another EA even if the purchasing EA met Allstate's objective criteria.

22.    Because of Allstate's policy that, in practice, effectively excludes existing EAs as potential purchasers, Allstate's refusal to consider existing EAs as potential

purchasers despite meeting the objective criteria, and because existing EAs are many times the only purchasers who could potentially qualify to purchase another EA's book of business, selling EAs are generally forced to sell their book of business at significantly below market price.

### B. Allstate Sabotages Ms. Budeanu's Success

23.    Despite having not worked in the insurance industry prior to entering into the Agency Agreement, Ms. Budeanu's exemplary work ethic and dedication took GV from the bottom five of her sales territory in productivity to the very top in just her first two years. Her success was reflected, in part, by her growing a book of business of approximately $5,000,000—a feat that took many EAs ten to fifteen years to accomplish—and her receipt of annual awards from 2017 forward. And she did this notwithstanding the roadblocks consistently placed in her way by Allstate's leadership in her region.

24.    As early as 2018, Ms. Budeanu satisfied Allstate's objective qualifications in place at that time to be a purchasing EA such that under the terms of her agreement with Allstate, Ms. Budeanu had a reasonable expectation that she would be considered as a potential purchaser of another EA's book of business.

25.    Because Ms. Budeanu satisfied the objective qualifications to be a purchasing EA, in late 2018/early 2019 she sought approval from Allstate to purchase two books of business from existing EAs, one being valued at approximately $1,200,000 and the other at approximately $2,000,000.

26.     At the time she sought to purchase these two existing books of business, the Southeast Regional Manager told Ms. Budeanu to submit her paperwork to her Field Sales Leader ("FSL"), Karen Thompson, for approval.

27.     Ms. Budeanu submitted the required documentation to Ms. Thompson as instructed.

28.     Instead of working to reward a highly successful EA, Allstate, through Ms. Thompson, deliberately ignored Ms. Budeanu's submissions.

29.     Because Ms. Thompson, as an FSL, had to approve any requests by Ms. Budeanu to purchase an existing EA's book of business, Ms. Thompson's failure to approve Ms. Budeanu's requests in 2018 prevented Ms. Budeanu from continuing to grow GV despite meeting Allstate's objective standards for purchasing EAs.

30.     In addition to refusing to approve Ms. Budeanu's requests to purchase the two existing EAs' books of business in 2018, Ms. Thompson also consistently harassed Ms. Budeanu, including, but not limited to, consistently referring to Ms. Budeanu derogatorily as "that Russian girl," even though Ms. Budeanu is not Russian.

31.     Ms. Thompson also consistently attempted to undermine and sabotage GV's success and Ms. Budeanu's relationships with her employees.

32.     For example, during Christmas week in 2019, Ms. Thompson intentionally ignored messages from Ms. Budeanu for five days related to funds GV inadvertently received for a customer not affiliated with GV.

33.     Ms. Thompson ignored Ms. Budeanu's messages despite knowing that regulations of the Financial Industry Regulatory Authority ("FINRA") did not allow GV to retain the funds at issue for more than 72 hours.

34.    As a result of Ms. Thompson's intentional failure to respond to Ms. Budeanu's messages, Ms. Budeanu was forced to escalate the issue to Allstate's regional leader on Christmas morning 2019 to address the pending emergency that would have negatively impacted GV and Allstate.

35.    Because of the ongoing challenges created by Ms. Thompson, Ms. Budeanu was assigned a new FSL in early 2020. However, the new FSL moved to California shortly thereafter, and Ms. Thompson assumed her prior role as Ms. Budeanu's FSL in mid-2020.

36.    When she was reassigned as Ms. Budeanu's FSL, Ms. Thompson put up even more roadblocks to Plaintiffs' success.

37.    As a result of Ms. Thompson's recalcitrance, Ms. Budeanu's Regional Manager, Eric Stone, began working directly with Ms. Budeanu. Though acknowledging some of Ms. Thompson's unprofessional and harassing behavior, Mr. Stone characterized such misbehavior as a "misunderstanding" between Ms. Thompson and Ms. Budeanu. This did not, however, deter Ms. Thompson's continued harassment.

38.    In November 2020, GV and other agencies throughout Georgia were experiencing numerous difficulties with new software and a new underwriting process implemented by Allstate.

39.    After one of GV's employees emailed Ms. Thompson requesting assistance, Ms. Thompson directly replied to only that employee (despite Ms. Budeanu being copied on the original email) and indicated that she refused to work with Ms. Budeanu.

40.    Additionally, on several occasions Ms. Thompson directed GV's employees to contact her directly as a way of undermining Ms. Budeanu's authority over GV's staff.

41.    Allstate failed to discipline Ms. Thompson for any of her actions.

42.     Despite Ms. Budeanu's direct complaints to Mr. Stone related to Ms. Thompson's actions and Ms. Budeanu's complaints to higher ups at Allstate related to the software and underwriting issues, Mr. Stone threatened to terminate the Agency Agreement if Ms. Budeanu lodged any additional complaints.

43.     Further, within days after lodging her additional complaints, Ms. Budeanu received a call informing her that Allstate was investigating a customer file handled by GV.

44.     Allstate initiated this baseless investigation in retaliation for Ms. Budeanu's complaints of, among other things, Allstate's software issues, Ms. Thompson's harassment of Ms. Budeanu, and Ms. Thompson's constant interference with Ms. Budeanu's relationship with GV employees.

45.     Further, the purpose of the investigation was to create a pretext for terminating the Agency Agreement and to force Ms. Budeanu to sell her book of business at a price significantly below fair market value.

46.     After learning of Allstate's investigation, Ms. Budeanu willingly met via Zoom with counsel for Allstate in January 2021. However, Ms. Budeanu did not know that the individual she was meeting was counsel for Allstate, and at no point during this meeting did Allstate's counsel identify herself as an attorney or inform Ms. Budeanu that she was Allstate's counsel.

47.     In her meeting with Allstate's counsel, Ms. Budeanu asked Allstate's counsel the basis for the investigation. In response, the Allstate attorney claimed that the investigation related to a declarations page provided by a customer—not by Ms. Budeanu or GV—that Allstate, without any evidence whatsoever, determined was not authentic.

48.     After her meeting with Allstate's counsel, Ms. Budeanu heard nothing about the investigation or its outcome for months.

49.     Over the next several months, Ms. Budeanu continued to grow GV, even receiving a bonus in February 2021 for approximately $150,000 for her hard work.

50.     In approximately March 2021, Ms. Budeanu submitted a request to Allstate to purchase an existing EA's book of business.

51.     This EA, Daniel White, owned an agency located approximately three miles from GV with a book of business of approximately $3,000,000.

52.     In April 2021, Mr. Stone informed Ms. Budeanu that she had qualified as an approved buyer of additional agencies and that she should move forward in her negotiation with other agencies to purchase any such agencies.

53.     Ms. Budeanu had satisfied Allstate's objective criteria to be a purchaser of an EA's book of business under the EA Agreement.

54.     At no point when Mr. Stone informed Ms. Budeanu that she was an eligible purchaser or that she should move forward in negotiating the purchase of other agencies did Mr. Stone ever mention to Ms. Budeanu that she was still under investigation or that the investigation revealed any misconduct on the part of Ms. Budeanu or GV.

55.     In anticipation of and in reliance upon Allstate's assurance that she was an eligible purchaser of other agencies and Allstate's directions that she move forward in negotiating with other agencies, Ms. Budeanu began negotiating with Mr. White and took several financially detrimental steps, including, but not limited to, executing a letter of intent with Mr. White, seeking and obtaining approval of a bank loan of approximately

$650,000, and hiring and training at least four new employees in anticipation of operating the second agency.

56.     When Mr. Stone informed Ms. Budeanu she was an eligible purchaser of other agencies and directed her to move forward in negotiating with other agencies, Allstate knew it would never approve Ms. Budeanu's purchase of another agency.

57.     Plaintiffs allege upon information and belief that Ms. Thompson—who had to approve any requests by Ms. Budeanu to purchase an existing EA's book of business— specifically told Mr. White that Allstate would never approve Ms. Budeanu's purchase of Mr. White's agency.

58.     Nonetheless, Allstate continued to tell Ms. Budeanu she was an eligible purchaser and advised her to move forward in her negotiations to purchase other agencies for purposes of inducing her to refrain from lodging complaints against her superiors.

59.     Despite Allstate's clear duty under the EA Contract to refrain from interfering in the negotiation of an EA's book of business and despite informing Ms. Budeanu she was an eligible purchaser and directing her to negotiate with other agencies, Allstate directly interfered in Ms. Budeanu's attempt to purchase another EA's agency.

C. **Allstate Wrongfully Terminates the Agency Agreement**

60.     On or about May 24, 2021, Ms. Budeanu emailed Glenn Shapiro, Allstate's then President of Property-Liability, to request assistance with the ongoing software issues and with other hiring-related issues Mr. Stone had been unable to resolve for more than two weeks. Shortly after her email to Mr. Shapiro, Ms. Budeanu received a call from

Allstate's corporate office instructing her to contact Mr. Shapiro directly should she need any assistance.

61.     Just two days later, on May 26, 2021, Ms. Budeanu received a "random" call from an individual inquiring about purchasing her agency. Ms. Budeanu informed this individual that she had no intention of selling GV at that time.

62.     Approximately fifteen (15) minutes later, Ms. Thompson and Mr. Stone called Ms. Budeanu to inform her that Allstate was terminating the Agency Agreement.

63.     When Ms. Budeanu mentioned her earlier call and questioned the basis for the termination, Ms. Thompson and Mr. Stone refused to provide Ms. Budeanu any clarity on what she did wrong and gave her only a few hours from the end of the call in which to close the office and remove her belongings from the office space GV leased. Ms. Budeanu was forced to incur costs to remove items from the property by the close of business that day.

64.     At the time Allstate terminated the Agency Agreement and forced Ms. Budeanu to vacate her office by the close of business that same day, Allstate failed to provide a written notice of termination as required under the Agency Agreement.

65.     Instead, in retaliation for lodging legitimate complaints against her superiors, Ms. Budeanu's Agency Agreement was illegally terminated without notice or basis.

66.     It was not until on or around July 7, 2021—approximately 45 days after Allstate terminated the Agency Agreement—that Ms. Budeanu received a termination letter backdated to May 27, 2021 ("Termination Letter"). A true and correct copy of the Termination Letter is attached hereto as **Exhibit 2.**

67.    The Termination Letter stated that the termination was "pursuant to Section XVII.B.3 of the [Agency] Agreement" and based on providing "false information to the company." The Termination Letter provided no additional clarity as to what purported false information had been allegedly provided to Allstate or any other details explaining the basis for the termination.

68.    At no point has Ms. Budeanu been told what false information was provided by GV or Ms. Budeanu or Allstate's basis for determining that such information was false.

69.    There was no legitimate basis for the purported investigation Allstate conducted. Rather, the purported investigation was a pretextual and baseless reason Allstate used to terminate the Agency Agreement to force Ms. Budeanu to sell her agency and book of business at a price significantly below fair market value.

70.    The Termination Letter also informed Ms. Budeanu that she may have the option of receiving a termination payment from Allstate or of selling her economic interest to an Allstate approved buyer pursuant to the EA Contract.

71.    The Termination Letter further informed Ms. Budeanu that any sale of her book of business had to be completed "on or before September 1, 2021" and that if Ms. Budeanu did not present a buyer or Allstate did not approve the buyer, Allstate would process the termination payment.

72.    By letter dated May 28, 2021, Allstate also demanded that Ms. Budeanu repay the approximately $150,000 bonus that she received ("Demand Letter"). A true and correct copy of the Demand Letter is attached hereto as **Exhibit 3**.

73.    After her receipt of the Termination Letter, Ms. Budeanu was forced to sell her agency—which, at the time, was valued at approximately $1,900,000—for

approximately $850,000. This sale was significantly below fair market value causing Ms. Budeanu sell her agency at a loss of more than $1,000,000.

74.   It was clear to potential purchasers that Allstate had terminated the Agency Agreement because Plaintiffs had no office space out of which to operate. Accordingly, potential purchasers of Ms. Budeanu's book of business were offering rock bottom purchase prices.

75.   Further, the only buyer Ms. Budeanu could find to close a deal within 90 days and that Allstate would approve was an existing EA that Allstate refused to initially approve despite this individual having been an EA for approximately 20 years and meeting the objective purchasing criteria for existing EAs.

76.   Allstate only approved the sale to this existing EA—who, like Ms. Budeanu, spoke Ukrainian and Romanian—after receiving customer demands that an agency be able to service customers who spoke, among other languages, Ukrainian and Romanian (customers Plaintiffs had previously serviced) and after forcing Ms. Budeanu to repay her approximately $150,000 bonus.

77.   Indeed, Ms. Budeanu complied with Allstate's demand to repay her bonus despite the bogus and unfounded investigation only because Allstate held its approval of her sale of her business hostage. If she had refused to repay the bonus Allstate would not have allowed her to sell her book of business and she would have received a termination payment from Allstate that would have been significantly less than the sale price of $850,000 that was, itself, significantly below market value.

78.     Further, at the time, Allstate refused to approve the sale to other qualified purchasers presented by Ms. Budeanu for the express purpose of causing Ms. Budeanu to sell her book of business at significantly below market value.

79.     Allstate's baseless and pretextual termination also caused Ms. Budeanu to have to pay back the approximately $650,000 bank loan she took out in preparation to purchase Mr. White's book of business.

80.     Thus, in addition to being forced to repay her bonus and sell her agency at significantly below market value, Plaintiffs suffered an additional loss of approximately $650,000 all as a result of Allstate's unlawful actions.

81.     For several weeks after Allstate terminated the Agency Agreement, Allstate refused to properly transfer the telephone system from GV to Allstate. As a result, Ms. Budeanu was forced to continually field hundreds of calls from Allstate customers and provide such customers with services for several weeks thereby rendering to Allstate during this time services without any compensation.

82.     Additionally, because of Allstate's sudden termination of the EA Contract, Ms. Budeanu incurred significant fees and costs associated with the premature and unexpected termination of GV's lease, including, but not limited to, legal fees to negotiate the termination of GV's lease.

83.     Ms. Budeanu planned to continue growing GV for several years to come and to continue to expand a book of business by purchasing additional books of business from Mr. White and other EAs. However, due to Allstate's breaches and tortious conduct, Plaintiffs suffered monetary damages, including, but not limited to, the loss of reasonably

expected income and the additional value the expected larger books of business would have netted in any future sale.

84.     After Allstate's bad faith termination of the EA Contract, Ms. Budeanu, personally and via her then counsel, reached out to Allstate to request documentation to support the reasons for the termination of the EA Contract. Continuing its pattern of bad faith, Allstate refused to provide any support for its termination of the contract.

85.     To the present day, Allstate has refused to provide any basis for or support of its "for cause" termination under the Agency Agreement.

### COUNT I – BREACH OF CONTRACT – WRONGFUL TERMINATION

86.     Plaintiffs incorporate by reference the allegations of Paragraphs 1-85 of the Complaint.

87.     The EA Contract, including the Agency Agreement, is a valid and binding contract that was intended to bind the parties.

88.     All conditions precedent to Plaintiffs' enforcement of the EA Contract have been performed or waived.

89.     Allstate initiated a baseless investigation in retaliation for Ms. Budeanu's complaints of, among other things, Allstate's software issues, Ms. Thompson's harassment of Ms. Budeanu, and Ms. Thompson's constant interference with Ms. Budeanu's relationship with GV employees.

90.     Further, the purpose of the investigation was to create a pretext for terminating the Agency Agreement and to force Ms. Budeanu to sell her book of business at a price significantly below fair market value.

91.     In reliance upon this baseless and pretextual investigation, Allstate purported to terminate the Agency Agreement for cause pursuant to Section XVII(B)(3).

92.     Allstate's termination of the Agency Agreement was without justification or cause and in bad faith in breach of the terms of the Agency Agreement.

93.     Allstate further breached the Agency Agreement by failing to provide Ms. Budeanu with immediate written notice, instead sending a backdated letter to Ms. Budeanu approximately 45 days after the purported termination of the Agency Agreement and after Allstate forced Ms. Budeanu and GV to vacate the leased premises.

94.     As a direct and proximate result of Allstate's breaches of the Agency Agreement, Plaintiffs have been harmed and have suffered damages in an amount to be proven at trial.

95.     As described in this Count, Allstate has acted in bad faith, has been stubbornly litigious and has caused Plaintiffs unnecessary trouble and expense. As such, Plaintiffs are entitled to their expenses of litigation, including, without limitation, attorneys' fees and costs. *See* O.C.G.A. §13-6-11.

## COUNT II – BREACH OF CONTRACT – INTERFERENCE IN PLAINTIFFS' PURCHASE OF EA AGENCY

96.     Plaintiffs incorporate by reference the allegations of Paragraphs 1-85 of the Complaint.

97.     The EA Contract, including the Agency Agreement, is a valid and binding contract that was intended to bind the parties.

98.     All conditions precedent to Plaintiffs' enforcement of the EA Contract have been performed or waived.

99.    Under the terms of the EA Contract, an objectively qualified EA seeking to purchase another EA's book of business has a reasonable expectation that its requests to purchase another EA's book of business would be considered by Allstate.

100.    Further, despite the discretion Allstate has under the EA Contract to approve a purchase or sale of an EA's book of business, Allstate is not authorized to interfere in the negotiations between a buyer and seller and has a duty not to interfere in such negotiations.

101.    Despite Plaintiffs performing all obligations under the EA Contract and Ms. Budeanu meeting Allstate's objective qualifications for a buyer of an EA's book of business, Allstate directly interfered in Ms. Budeanu's negotiations with Mr. White, whose book of business she intended to purchase, by, among other ways, telling Mr. White that Allstate would never approve Ms. Budeanu's purchase of Mr. White's agency.

102.    Allstate's interference in Ms. Budeanu's negotiations to purchase Mr. White's agency constituted a breach of the EA Contract.

103.    As a direct and proximate result of Allstate's breaches of the Agency Agreement, Plaintiffs have been harmed and have suffered damages in an amount to be proven at trial.

104.    As described in this Count, Allstate has acted in bad faith, has been stubbornly litigious and has caused Plaintiffs unnecessary trouble and expense. As such Plaintiffs are entitled to their expenses of litigation, including, without limitation, attorneys' fees and costs. *See* O.C.G.A. §13-6-11.

## COUNT III – BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

105.   Plaintiffs incorporate by reference the allegations of Paragraphs 1-85 of the Complaint.

106.   The EA Contract, including the Agency Agreement, is a valid and binding contract that was intended to bind the parties.

107.   All conditions precedent to Plaintiffs' enforcement of the EA Contract have been performed or waived.

108.   All contracts, including the EA Contract, include an implied covenant of good faith and fair dealing in the contract's performance and enforcement.

109.   Further, when a contract vests a party with discretionary decision-making authority, such authority must be carried out in good faith and involve the exercise of honest judgment.

110.   Under the Agency Agreement, which is part of the EA Contract, Allstate is allowed discretion to terminate the Agency Agreement "with cause, immediately upon providing written notice to [Ms. Budeanu]." (Ex. 1 at p. 8 § XVII(B)(3)).

111.   Although Allstate has discretion under the EA Contract, its discretion must be exercised in good faith and involve the exercise of honest judgment.

112.   Allstate breached its duty to exercise its discretion in good faith and honest judgment by terminating the Agency Agreement for baseless, arbitrary, and capricious reasons.

113.   As a direct and proximate result of Allstate's breaches, Plaintiffs have been harmed and have suffered damages in an amount to be proven at trial.

114. As described in this Count, Allstate has acted in bad faith, has been stubbornly litigious and has caused Plaintiffs unnecessary trouble and expense. As such, Plaintiffs are entitled to their expenses of litigation, including, without limitation, attorneys' fees and costs. *See* O.C.G.A. §13-6-11.

## COUNT IV – BREACH OF FIDUCIARY DUTIES

115. Plaintiffs incorporate by reference the allegations of Paragraphs 1-85 of the Complaint.

116. Pursuant to the express terms of the Agency Agreement, Ms. Budeanu was appointed as Allstate's "agent to represent the Company in the Exclusive Agency Program." (Ex. 1 at p. 1 § A.)

117. Further, pursuant to the express terms of the Agency Agreement, Plaintiffs maintained the authority to "receive and accept…applications for insurance" on behalf of Allstate, "sell products specified by the Company," and act on behalf of Allstate or enter into any binding contract on behalf of Allstate "for contracts of insurance or other contracts as expressly authorized by this Agreement." (Ex. 1 at p. 1 § D.)

118. As such, a fiduciary or confidential relationship existed between Plaintiffs and Allstate.

119. Allstate owed Plaintiffs fiduciary duties of good faith, fidelity, and loyalty.

120. Allstate tortiously and wrongfully breached its fiduciary duties to Plaintiffs by, among other things: (1) initiating a baseless investigation into Plaintiffs in retaliation for Ms. Budeanu's complaints of, among other things, Allstate's software issues, Ms. Thompson's harassment of Ms. Budeanu, and Ms. Thompson's constant interference with Ms. Budeanu's relationship with GV employees and for the purposes of terminating the

Agency Agreement to force Ms. Budeanu to sell her book of business at significantly below fair market value; (2) having in place a blanket policy under which it would refuse to consider Ms. Budeanu's request to purchase another EA's book of business despite its misrepresentations to her otherwise; (3) interfering in Ms. Budeanu's negotiations to purchase a second EA's (Mr. White) book of business; and (4) terminating the Agency Agreement for baseless, arbitrary, and capricious reasons.

121.   As a direct and proximate result of Allstate's tortious conduct, Plaintiffs have been harmed and have suffered damages in an amount to be proven at trial.

122.   As described in this Count, Allstate has acted in bad faith, has been stubbornly litigious and has caused Plaintiffs unnecessary trouble and expense. As such, Plaintiffs are entitled to their expenses of litigation, including, without limitation, attorneys' fees and costs.  *See* O.C.G.A. §13-6-11.

123.   Further, Allstate evidenced a specific intent to cause harm to Plaintiffs. Because Allstate's actions showed willful misconduct, malice, fraud, wantonness, oppression or that entire want of care which would raise the presumption of conscious indifference to consequences, Plaintiffs are entitled to recover punitive damages.

## COUNT V – FRAUDULENT MISREPRESENTATION

124.   Plaintiffs incorporate by reference the allegations of Paragraphs 1-85 of the Complaint.

125.   In April 2021, Allstate informed Ms. Budeanu that she had met the eligibility requirements to purchase additional agencies and directed her to move forward in her negotiation for the purchase of other agencies. As such, under the EA

Agreement Ms. Budeanu had satisfied Allstate's objective criteria to be a purchaser of an EA's book of business.

126. However, at the time Allstate informed Ms. Budeanu that she had met the eligibility requirements to purchase additional agencies and directed her to move forward in her negotiation with other agencies to purchase such agencies, Allstate knew that it would never approve Ms. Budeanu's request, thus making its contrary declarations willful misrepresentations to Ms. Budeanu.

127. Allstate told Ms. Budeanu that her request would be approved for purposes of inducing her to refrain from lodging complaints against her superiors.

128. In anticipation of and in reasonable reliance upon Allstate's assurance that she was an eligible purchaser of other agencies and Allstate's directions that she move forward in negotiating with other agencies, Ms. Budeanu began negotiating with Mr. White and took several financially detrimental steps, including, but not limited to, executing a letter of intent with Mr. White, seeking and obtaining approval of a bank loan of approximately $650,000, and hiring and training at least four new employees in anticipation of operating the second agency.

129. Allstate's misrepresentations to Plaintiffs were material to Plaintiffs' actions.

130. Allstate owed Plaintiffs a duty not to misrepresent material information.

131. As a direct and proximate result of Allstate's misrepresentations, Plaintiffs have been harmed and have suffered damages in an amount to be proven at trial.

132. As described in this Count, Allstate has acted in bad faith, has been stubbornly litigious and has caused Plaintiffs unnecessary trouble and expense. As such,

Plaintiffs are entitled to their expenses of litigation, including, without limitation, attorneys' fees and costs. *See* O.C.G.A. §13-6-11.

133.   Further, Allstate evidenced a specific intent to cause harm to Plaintiffs. Because Allstate's actions showed willful misconduct, malice, fraud, wantonness, oppression or that entire want of care which would raise the presumption of conscious indifference to consequences, Plaintiffs are entitled to recover punitive damages.

## COUNT VI – UNJUST ENRICHMENT

134.   Plaintiffs incorporate by reference the allegations of Paragraphs 1-85 of the Complaint.

135.   For several weeks after Allstate terminated the Agency Agreement, Allstate refused to properly transfer the telephone system from GV back to Allstate. As a result, Ms. Budeanu was forced to field numerous calls from Allstate customers thereby rendering post-termination services to Allstate for which Plaintiffs were not compensated.

136.   Allstate would be unjustly enriched if it was permitted to enjoy the benefits of the services Plaintiffs rendered to Allstate without compensating Plaintiffs for the same.

WHEREFORE, Plaintiffs respectfully pray for the following relief:

(1) That this Court render judgment in favor of Plaintiffs and against Allstate for actual, consequential, nominal, and uncapped punitive damages;

(2) That this Court render judgment in favor of Plaintiffs and against Allstate for pre and post-judgment interest as well as attorneys' fees and other expenses of litigation pursuant to O.C.G.A. § 13-6-11;

(3) That this Court tax all costs against Allstate;

(4) That Plaintiffs has a trial by jury; and

(5) That this Court enter such other and further relief as it deems just and proper

under the circumstances.

Dated: September 27, 2022

Respectfully submitted,

*/s/ Cary Ichter*
Cary Ichter
Georgia Bar No. 382515
Oladimeji Ogunsola
Georgia Bar No. 857808
Ichter Davis, LLC
400 Interstate N. Parkway SE
Suite 860
Atlanta, GA 30339
Telephone (404) 869-7600
Facsimile (404) 602-0037
cichter@ichterdavis.com
dogunsola@ichterdavis.com

*Counsel for Plaintiffs*

# EXHIBIT 1

*Allstate R3001S Exclusive Agency Agreement*

# ALLSTATE R3001S EXCLUSIVE AGENCY AGREEMENT

This Agreement is between ALLSTATE INSURANCE COMPANY and such affiliates and subsidiaries as are named in the Supplement for the R3001 Agreement (referred to in this Agreement as "the Company") and _Viorica Dudeariu_ (referred to in this Agreement as "you").

The Company and you agree as follows:

I.  **AUTHORITY:**

A.  Effective _6-1-2016_, the Company appoints you as its agent to represent the Company in the Exclusive Agency Program. You are authorized on behalf of the Company, during the term of this Agreement, to receive and accept, subject to such restrictions on binding authority as may be established by the Company, applications for insurance covering such classes of risks located in the state(s) of _Georgia_ as the Company may from time to time authorize to be written. You are also authorized to sell products specified by the Company and through the companies specified in the Supplement for the R3001 Agreement (referred to in this Agreement as "Company Business"). The Company will own all business produced under the terms of this Agreement. You will not represent yourself as having any authority other than that specifically granted to you by the Company. You will not alter any contract or incur any expense or obligation for the Company without prior written approval from the Company.

B.  This Agreement is the sole and entire agency agreement between the Company and you, and it supersedes and replaces any prior employment, agency, or other agreement between the Company and you. This Agreement also supersedes any prior oral statements and representations by the Company to you and any prior written statements and representations by the Company to you in letters, manuals, booklets, memoranda, or any other format.

C.  The Supplement for the R3001 Agreement ("Supplement") and the Exclusive Agency Independent Contractor Manual ("EA Manual"), and the Allstate Agency Standards ("Agency Standards") as they may be amended from time to time, are expressly incorporated in their entirety as part of this Agreement. The Company reserves the right to amend the Supplement, EA Manual, and Agency Standards at any time without prior notice to you, except that notice regarding changes to commission amounts will be given as indicated in Section XV.

D.  You are an independent contractor for all purposes and not an employee of the Company. You will have full control of your time and the right to exercise independent judgment as to the time, place, and manner of performing your duties, which are defined in this Agreement and the incorporated Supplement, EA Manual, and Agency Standards. You will not represent that you have authority to act on behalf of the Company or enter into any contract on behalf of the Company, except for contracts of insurance or other contracts as expressly authorized by this Agreement.

E.  You will not, either directly or indirectly, solicit, sell, or service insurance of any kind for any other company, agent, or broker, or refer a prospect to another company, agent, or broker, without the prior written approval of the Company. You may, however, write applications for insurance under an assigned risk, cooperative industry, or government established residual market plan or facility in accordance with the Company's rules and procedures.

1

R3001S-3   04/01/2008

F. The Company will determine in its sole discretion all matters relating to its business and the operation of the Company including, but not limited to, the following:

1. The determination of contract forms and provisions, premiums, fees, and charges for insurance and other Company Business;

2. The acceptance or rejection of any application;

3. The termination or modification of any contract or the refusal to renew any contract;

4. The limitation, restriction, or discontinuance of the writing or selling of any policies, coverages, lines, or kinds of insurance or other Company Business;

5. The obtaining of any licenses of the Company or the Company's withdrawal from any state, jurisdiction, or territory; and

6. The type and quality of customer service received by Company policyholders.

II. **DUTIES AND CONDITIONS:**

A. You will act as an agent of the Company for the purpose of soliciting, selling, and servicing insurance and other Company Business in accordance with the provisions of this Agreement. As an agent of the Company, you will provide customer service, including the collection of payments, for any and all Company policyholders and you will assist in claims administration in accordance with the Company's rules and procedures.

B. You will meet certain business objectives established by the Company in the areas of profitability, growth, retention, customer satisfaction and customer service. You will build and maintain a profitable book of business, assist the Company in its efforts to achieve market penetration for all forms of insurance offered by the Company and other Company Business, and service the Company's customers in a manner consistent with the Company's goodwill, reputation, and overall business strategy.

C. You will record, transmit, and process insurance and Company Business in the manner prescribed in the then current provisions of the Supplement.

D. You agree to maintain any required agent license in the state or states in which you are appointed to represent the Company and to comply with any and all applicable federal, state, or local laws, rules, regulations and ordinances affecting your operation.

E. The Company recognizes that you may, in your sole discretion, arrange to have business conducted at your sales location in your absence by your own employees or other persons and that the time during which you are physically present at your sales location is entirely in your sole discretion. You must, however, remain actively involved in the conduct of business at your sales location.

F. You agree that the Company will have the authority to use your name and signature, or facsimile thereof, on policy documents and customer communication materials.

G. You agree to maintain a professional business relationship with the Company, and, when requested, to meet with Company representatives at mutually convenient times to discuss various business topics. You also agree that, because you are conducting business with the public under the Allstate name, Company representatives shall be permitted access to your agency to review compliance with this Agreement during agency business hours.

H. You agree that, as requested by the Company, you will demonstrate your knowledge of the Company products you are authorized to sell, as well as of federal, state, or local laws, rules, regulations and ordinances affecting your operation. If you are unable to demonstrate your knowledge of any product, the Company reserves the right to deny you the authority, or withdraw your existing authority, to sell that product until you demonstrate such knowledge.

## III.   YOUR EMPLOYEES:

A. You have no authority to employ persons on behalf of the Company, and no employee of yours will be deemed to be an employee or agent of the Company, such employees at all times remaining your employees. You have sole and exclusive control over your labor and employee relations policies, and your policies relating to wages, hours, and working conditions of your employees. You have the sole and exclusive right to hire, transfer, suspend, lay off, recall, promote, assign, discipline, and discharge your employees.

B. You are solely responsible for all salaries and other compensation of all your employees and will make all necessary salary deductions and withholdings from your employees' salaries and other compensation. You are solely responsible for the payment of any and all contributions, taxes, and assessments, and all other requirements of the federal Social Security, federal and state unemployment compensation, and federal, state, and local withholding of income tax laws on all salary and other compensation of your employees.

C. You will comply with all other contracts, federal, state or local laws, ordinances, rules, or regulations regarding your employees, including federal or state laws or regulations regarding minimum compensation, overtime, and equal opportunities for employment. This includes, but is not limited to, your warranty and agreement to comply with the terms of the federal and state civil rights acts, Age Discrimination in Employment Act, Americans With Disabilities Act, Occupational Safety and Health Act, Immigration Reform and Control Act, and the Fair Labor Standards Act.

D. You agree and warrant that your employees, while working in connection with this Agreement, will comply with any and all applicable federal, state, or local laws, rules, regulations, and ordinances.

## IV.   COMPANY PROPERTY, CONFIDENTIALITY:

A. The Company will furnish you such signs, forms, manuals, records, and other materials and supplies as the Company deems advisable to assist you. All such property and information furnished by the Company will remain the property of the Company. In addition, the Company will offer, at your expense, such additional materials and supplies as the Company feels may be helpful to you.

B. You agree that you will not at any time or in any manner, directly or indirectly, disclose to any third party or permit any third party to access any confidential information or any information containing trade secrets concerning any matters affecting or relating to the pursuits of the Company, except upon direct written authority of the Company. Furthermore, upon termination of this Agreement, you agree to treat as confidential and not to disclose, either directly or indirectly, to any third party any confidential information or trade secrets of the Company.

C. You agree that you will not disclose or grant access to any confidential information or trade secrets to any of your employees or other persons providing services for you in connection with this Agreement, unless such employee or other person has signed a copy of the Confidentiality and Non-Competition Agreement attached as Appendix A. Appendix A is a sample copy of the electronic version of the document that must be transmitted to the Company.

D. Confidential information includes, but is not limited to: business plans of the Company; information regarding the names, addresses, and ages of policyholders of the Company; types of policies; amounts of insurance; premium amounts; the description and location of insured property; the expiration or renewal dates of policies; policyholder listings and any policyholder information subject to any privacy law; claim information; certain information and material identified by the Company as confidential or information considered a trade secret as provided herein or by law; and any information concerning any matters affecting or relating to the pursuits of the Company that is not otherwise lawfully available to the public. All such confidential information is wholly owned by the Company. Such confidential information may be used by you only for the purposes of carrying out the provisions of this Agreement.

E. Any confidential information or trade secrets recorded on paper, electronic data file, or any other medium, whether provided by the Company or by you, is the exclusive property of the Company, as is any such medium and any copy of such medium.

F. You recognize that a breach of the foregoing provisions will cause irreparable damage to the Company's business and that such damage is difficult or impossible to measure. You agree that in the event of such breach, the Company, in addition to such other rights and remedies it may have, will be immediately entitled to an order granting injunctive relief from any court of competent jurisdiction against any act which would violate any such provision, without the necessity of posting a bond, and you waive any defense to an application for such order, except that the violation did not occur. You agree that the Company will be entitled to an award of reasonable attorneys' fees in the event that it is successful in an application for injunctive relief or in an action based upon breach of the foregoing provisions.

## V. SALES LOCATION:

A. You may select your sales location, within a geographical area specified by the Company, subject to Company approval. Initially, you have selected the location at 2784 N Decatur rd Ste100 and such sales location has been approved by the Company. You agree that you will not establish any additional sales location without the prior written approval of the Company. You understand that you have no exclusive territorial rights in connection with your sales location.

B. You agree to keep your sales location open for business as appropriate in the market to provide a proper level of customer service. As a minimum, you agree to operate your sales location consistently with the Agency Standards.

C. You are authorized to sell insurance offered by the Company and Company Business only in the state containing your sales location and other states in which you are properly licensed and appointed as an agent by the Company.

## VI. ADVERTISING:

A. The Company will advertise its products and provide promotional material in accordance with its advertising policies. You may also advertise in your sole discretion, subject to the requirements in paragraph B. below.

B. You will submit all signs and advertising copy, including, but not limited to, sales brochures, display advertisements in telephone directories, newspaper advertisements, radio and television commercials, electronic media displays, all sales promotional plans and devices, and all other materials to the Company for approval, if they use or contain any reference to any service mark or trade name of the Company. You will not use any such advertising material or sales promotional plan or device without obtaining prior written approval from the Company. The Company has the right to disapprove any or all of the aforesaid advertising forms and other materials insofar as they, in the exclusive judgment of the Company, do not conform to Company policy regarding use of Company service marks or trade names; may subject the Company to liability or loss of goodwill; may damage the reputation of the Company or Company customer relations; may fail to adhere to the requirements of any federal, state, or local governmental rules, regulations, or laws; may fail to

4

conform to community or Company standards of good taste and honest dealing; or may be detrimental to the business interests of the Company.

VII.  **SERVICE MARK AND TRADE NAME PROTECTION:**

A.  You agree to cooperate fully in the quality control program conducted by the Company relating to the use of its service marks and trade names and the nature and quality of services rendered and goods distributed under its service marks and trade names. The Company will have the right to specify, delineate, or limit the services or goods in connection with which you may use any of its service marks or trade names. In the event that the nature or the quality of the services or goods in connection with which you use any of the service marks or trade names of the Company is not acceptable to the Company, then the Company will have the right to require you to institute appropriate procedures to correct any deficiencies noted by the Company.

B.  You agree, at the request and expense of the Company, to assist the Company in protecting and enforcing the rights of the Company in and to any and all of its service marks and trade names which you may then be using.

C.  You will not in any manner encumber, alienate, license, or transfer to any other entity any right whatsoever concerning the service marks or trade names the Company authorizes you to use in the performance of this Agreement, except as permitted in Section XVI.

D.  You recognize that a breach of the foregoing provisions will cause irreparable damage to the Company's business and that such damage is difficult or impossible to measure. You agree that in the event of such breach, the Company, in addition to such other rights and remedies it may have, will be immediately entitled to an order granting injunctive relief from any court of competent jurisdiction against any act which would violate any such provision, without the necessity of posting a bond, and you waive any defense to an application for such order, except that the violation did not occur. You agree that the Company will be entitled to an award of reasonable attorneys' fees in the event that it is successful in an application for injunctive relief or in an action based upon breach of the foregoing provisions.

VIII.  **EXPENSES:**

You will be responsible for the payment of all expenses that you incur in the performance of this Agreement including, but not limited to:  expenses for your sales location, supplies not furnished by the Company, compensation of your employees or other assisting persons whom you engage, telephone, postage, and advertising expenses incurred at your direction, and all other charges and expenses.

IX.  **TELEPHONE:**

All telephone numbers used in connection with business conducted pursuant to this Agreement are the property of the Company.

X.  **INDEMNIFICATION:**

A.  The Company will defend and indemnify you against liability, including the cost of defense and settlements, imposed on you by law for damages sustained by policyholders and caused by acts or omissions of the Company, provided that you have not caused or contributed to cause such liability by your acts or omissions. You agree, as a condition to such indemnification, to notify the Company promptly of any claim or suit against you and to allow the Company to make such investigation, settlement, or defense as the Company deems prudent. The Company reserves the right to select counsel to represent you in connection with any such claim or suit. You also agree to cooperate fully with the Company in any such investigation, settlement, or defense.

B.  You will indemnify the Company against liability, including the cost of defense and settlements, imposed on the Company by law for damages sustained by any person and caused by your acts or omission, or those of any employee or other person working in connection with this Agreement, provided that the Company has not caused or contributed to cause such liability by its acts or omissions. The Company agrees, as a condition to such indemnification, to notify you promptly of any such claim or suit against the Company. The Company reserves the right to select counsel to represent it in connection with any such claim or suit and to make such investigation or settlement as the Company deems prudent.

## XI.   INSURANCE:

A.  You agree that you will, at your sole expense, obtain and maintain during the term of this Agreement policies of insurance as described in the EA Manual, as may be amended from time to time. Such policies must be obtained from companies satisfactory to the Company and must be adequate to protect against all expenses, claims, actions, liabilities, and losses related to the subjects covered by the required policies.

B.  Where specified, each policy must name the Company as an additional insured and must contain a severability of interest/cross liability endorsement. Each policy must also expressly provide that it will not be subject to material change or cancellation without at least thirty (30) days prior written notice to the Company.

C.  You must furnish the Company with proof of insurance upon request by the Company. If, in the Company's opinion, such policies do not afford adequate protection for the Company, the Company will so advise you, and if you do not furnish evidence of acceptable coverage within fifteen (15) days after being requested to do so by the Company, the Company will have the right to obtain additional insurance at your expense and deduct the cost of such insurance plus a processing fee from monies owed you by the Company.

## XII.   FINANCIAL INFORMATION:

You shall maintain all books and records relating to the business under this Agreement including, but not limited to, all checkbooks, check registers, deposit receipts, and general ledgers for a period of not less than five years after the close of the fiscal year to which they relate. All of the foregoing records shall be open and available for inspection or audit at any time during normal agency hours without notice by the Company or its designated auditors and you shall have the duty to cooperate fully with the party(ies) making such inspection or audit.

## XIII.   POLICIES IN YOUR ACCOUNT:

Policies which are credited to your account are described in the Supplement. While this Agreement is in effect, the Company will leave in your account all policies credited to your account so long as the policyholder resides within a state in which you are licensed and appointed by the Company, except that the Company may remove any policy from your account at the request of a policyholder.

## XIV.   MONEY COLLECTED BY YOU:

All payments collected or received by you in the performance of this Agreement are the property of the Company, will be treated as trust funds, and will be promptly transmitted to the Company without deduction for any purpose in the manner specified by the Company. You must maintain accurate records and current remittance reports which may be inspected by the Company at any time without notice and which shall be submitted to the Company in accordance with its rules and procedures.

XV.   **COMPENSATION:**

A.   The sole compensation to which you will be entitled for services rendered pursuant to this Agreement will be the commissions set forth in the Supplement, as may be amended from time to time. The Company will pay you your commissions at the time and in the manner set forth in the Supplement. However, due to the inherent uncertainty of business conditions, the Company reserves the right to increase or decrease any commission amounts and to change the commission rules. If the Company changes commission amounts, it will provide you with written notice of the changes at least ninety (90) days prior to the date on which they are to become effective.

B.   The Company may provide you with such bonuses, awards, prizes, and other remuneration based on performance, if any, as it may prescribe in its sole discretion.

C.   If any application for insurance is rejected, or any policy is surrendered or canceled, in whole or in part, for any reason, before the expiration of the policy period, or if any premium is reduced or any overpayment made to you, or if any premium paid is not earned by the Company, the commissions paid to you on the amount returned or credited to the policyholder, or the amount overpaid to you, will constitute an indebtedness of yours to the Company and will be charged to you or recovered from you by reducing any future commissions, awards, or bonuses due you.

XVI.   **TRANSFER OF INTEREST:**

A.   This Agreement is personal to you and is being entered into in reliance upon and in consideration of your skills, qualifications, and representations. Accordingly, you may not execute a transfer of your interest in this Agreement or any interest in the business under this Agreement including, but not limited to, any sale, assignment, conveyance or the granting of any lien, security interest, pledge, or mortgage thereof, without the prior written approval of the Company. A transfer of interest in this Agreement is described in the Supplement and EA Manual and includes, but is not limited to, any sale, merger, or assignment, in whole or in part, directly, indirectly, or contingently, of this Agreement or any rights or obligations under it. You have the obligation to notify the Company of a proposed transfer and to request Company approval.

B.   You have an economic interest, as defined in this Agreement and the incorporated Supplement and EA Manual, in your Allstate customer accounts developed under this Agreement. Subject to the terms and conditions set forth in this Agreement and the incorporated Supplement and EA Manual, you may transfer your entire economic interest in the business written under this Agreement upon termination of this Agreement by selling the economic interest in the business to an approved buyer. The Company retains the right in its exclusive judgment to approve or disapprove such a transfer. Any failure to disclose and obtain the prior written approval of the Company for any transfer of your interest in this Agreement or any interest in the business under this Agreement shall constitute a breach of this Agreement and cause for termination of this Agreement.

C.   Approval of a proposed transfer of your entire interest in this Agreement will be conditioned upon the termination of this Agreement and the execution of a then current agency agreement by the proposed transferee.

D.   Policies in your account (Section XIII. above) will be transferred to an approved transferee.

**XVII.    TERMINATION OF AGREEMENT:**

A.  This Agreement will be terminated automatically:

1.  On the effective date of any transfer of your entire interest in this Agreement, whether approved or not, as described in Section XVI. above;

2.  Upon your death or permanent incapacity;

3.  Upon your loss of any required agent license; or

4.  Upon the surrender of, or the election not to renew, the Company's license to sell insurance in all lines in the state in which your sales location is located or the discontinuation of the sale of insurance in the state.

B.  This Agreement may be terminated:

1.  At any time by mutual agreement of the parties in writing;

2.  By either party, with or without cause, upon providing ninety (90) days prior written notice to the other, or such greater number of days as is required by law.  Once written notice of termination has been given by either party, you will, immediately upon request of the Company, cease to act or to represent yourself in any way as an agent or representative of the Company, but you will receive compensation pursuant to Section XV. from the Company for the period up to and including the specified termination date; or

3.  Alternatively, by the Company, with cause, immediately upon providing written notice to you. Cause may include, but is not limited to, breach of this Agreement, fraud, forgery, misrepresentation or conviction of a crime.  The list of examples of cause just stated shall not be construed to exclude any other possible ground as cause for termination.

**XVIII.    OBLIGATIONS UPON TERMINATION OF AGREEMENT:**

Except as otherwise provided in a subsequent agreement between you and the Company, upon termination of this Agreement, you agree that:

A.  You will not act or represent yourself in any way as an agent or representative of the Company.

B.  You will immediately return all property belonging to the Company, or dispose of it in such manner as the Company specifies.

C.  You will immediately cease to use such telephone numbers referenced in Section IX. above and execute an Order of Transfer of Responsibility for such numbers in your name to the Company or to any party the Company designates, and you will immediately notify the telephone company of any such transfer.  You will be responsible for all charges incurred up to the date of execution of the transfer.

D.  For a period of one year following termination, you will not solicit the purchase of products or services in competition with those sold by the Company:

1.  With respect to any person, company, or organization to whom you or anyone acting on your behalf sold insurance or other products or services on behalf of the Company and who is a customer of the Company at the time of termination of the Agreement;

2.  With respect to any person, company, or organization who is a customer of the Company at the time of termination of this Agreement and whose identity was discovered by you as a result of your status as a Company agent or as a result of your access to confidential information of the Company; or

8

3. From any office or business site located within one mile of the agency sales location maintained pursuant to Section V. of this Agreement at the time this Agreement is terminated.

In the event that such one year period or one mile distance exceeds the time or distance permitted by any applicable law, such period or distance will be automatically adjusted to the maximum period or distance permitted by such law. If any other provision in this paragraph D. conflicts with any existing law, it will be applied to the extent permitted by such law.

E. You will immediately cease and desist from any and all use of Company service marks and trade names. You will immediately return to the Company all property in your possession or under your control bearing any Company service mark or trade name, or dispose of it in such manner as the Company specifies.

F. You recognize that a breach of any of the foregoing provisions will cause irreparable damage to the Company's business and that such damage will be difficult or impossible to measure. You agree that in the event of any such breach, the Company, in addition to such other rights and remedies as it may have, will be immediately entitled to an order granting injunctive relief from any court of competent jurisdiction against any act which would violate any such provision, without the necessity of posting a bond, and you waive any defense to an application for such order, except that the violation did not occur. You agree that the Company will be entitled to an award of reasonable attorneys' fees in the event that it is successful in an application for injunctive relief or in an action based upon breach of the foregoing provisions.

G. You recognize and acknowledge that each of the foregoing provisions of this Section XVIII. is reasonable and necessary to protect and preserve the legitimate business interests of the Company, its present and potential business activities, and the economic benefits derived therefrom. You recognize and acknowledge that the foregoing provisions will not prevent you from earning a livelihood and are not an undue restraint on you.

XIX. **NOTICE:**

All notices will be deemed to have been given if personally delivered, sent by facsimile transmission, or mailed as follows:

if to the Company:          Allstate Insurance Company

                            _____

                            _____

                            Attention:_____

if to you:                  Viorica Budeanu

                            2784 N Decatur Rd Ste 100

                            Decatur  GA  30033

or to such other person or address as any party may furnish or designate to the other in writing.

XX. **GENERAL PROVISIONS:**

A. This Agreement may not be modified except by a written agreement between the Company and you which expressly states that it modifies this Agreement. No other written statements, representations, or agreements and no oral statements, representations, or agreements will be effective to modify this Agreement. No representative of the Company will have authority to modify this Agreement, except as provided in this Section XX. Nothing in this Section will affect the Company's right to amend the Supplement, EA Manual, and Agency Standards, as provided in Section I.C.

9

B. You acknowledge that you have reviewed the Supplement, EA Manual, and Agency Standards and that you have an ongoing responsibility to review all changes to the Supplement, EA Manual and Agency Standards issued by the Company and agree to be bound by them.

C. References in this Agreement to the Supplement, EA Manual, and Agency Standards are references to the Supplement, EA Manual, and Agency Standards, including any changes which may be made from time to time and distributed to you by the Company.

D. You acknowledge that you have read this Allstate R3001S Exclusive Agency Agreement, understand it, and agree to be bound by its terms.

E. The authority granted to you under this Agreement is nonexclusive. The term "Exclusive" as used in the title of this Agreement refers to the obligations assumed by you under Section I.E.

F. The descriptive headings of this Agreement are intended for reference only and will not affect the construction or interpretation of this Agreement.

G. If any provision or part of this Agreement is held invalid for any reason, such invalidity will not affect any other provision or part of this Agreement not held invalid, and such remaining provisions and parts will remain in full force and effect.

H. The failure of either party to insist upon the performance of any of the terms of this Agreement in any one or more instances will not be construed as a waiver or relinquishment of the future performance of any such term. The obligation of the parties with respect to any such future performance will continue in full force and effect.

I. Nothing in this Agreement shall be construed to confer upon any person or entity other than the Company and you any rights under this Agreement.

J. This Agreement, and the obligations or rights hereunder, shall not be assignable by you, except as provided by Section XVI. The rights and obligations of the parties to this Agreement shall be binding upon and inure to the benefit of the Company and its successors and assigns.

K. This Agreement may be executed in counterparts, each of which will be deemed an original.

IN WITNESS WHEREOF, the Company and Agency have caused this Agreement to be executed by their authorized representatives and the parties hereby accept the terms of this Agreement.

ALLSTATE INSURANCE COMPANY

_____
(authorized representative)

6 ~ 1 - 16
(date)

YOU

_____
(name)

05-09-16
(date)

10

**R3001S**
**APPENDIX A**

This Confidentiality and Non-Competition Agreement ("Agreement") is entered into this _____ day of _____ , _____ , by and between _____(referred to in this Agreement as "Service Provider"), and _____ (referred to in this Agreement as "Agent"), and Allstate Insurance Company as a direct third party beneficiary of this Agreement (referred to in this Agreement as "the Company").

WHEREAS, the Company has entered into an agency agreement appointing Agent to act as its agent for the purpose of receiving and accepting applications for insurance and for selling certain specified products of the Company's subsidiaries and affiliates; and

WHEREAS, under the terms of the agency agreement, Agent has agreed to maintain the confidentiality of the Company's confidential information; and

WHEREAS, Agent has employed Service Provider to assist Agent in performing services under the agency agreement; and

WHEREAS, Service Provider will have access to certain confidential information of the Company;

NOW, THEREFORE, for and in consideration of the agreements, covenants, and conditions herein contained, the adequacy and sufficiency of which is expressly acknowledged by each of the parties hereto, the parties agree as follows:

1.  The terms "employed" or "employment" as applied to in this Agreement apply to any service provided by the Service Provider as an employee, independent contractor, or in any other capacity.

2.  Service Provider acknowledges that while assisting Agent in performing services under the agency agreement, Service Provider will have access to or will have disclosed to him/her confidential information concerning the Company, the disclosure of which would be harmful to the Company.

3.  Confidential information includes, but is not limited to business plans of the Company; information regarding the names, addresses, and ages of policyholders or prospective policyholders of the Company; types of policies; amounts of insurance or premium amounts; the description and location of insured property; the expiration or renewal dates of policies; policyholder listings and any policyholder information subject to any privacy law; claim information; certain information and material identified by the Company as confidential or information considered a trade secret as provided herein or by law; and any information concerning any matters affecting or relating to the pursuits of the Company that is not otherwise lawfully available to the public. Confidential information may be oral or recorded on paper, electronic data file, or any other medium.

4.  Service Provider agrees that he/she will not at any time or in any manner, directly or indirectly, disclose to any third party or permit any third party to access any confidential information, except upon the written consent of the Company, nor will Service Provider use any confidential information for his/her own benefit, except for the purposes of assisting Agent in performing services under the agency agreement.

5.  Any and all confidential information and all Company forms, manuals, records, and other materials and supplies furnished to Service Provider by the Agent will at all times remain the property of the Company and will be returned to the Company at any time upon the demand of the Company or upon the termination of Service Provider's employment by Agent.

6.  Upon the termination of Service Provider's employment by Agent, Service Provider agrees to treat as confidential and not disclose, either directly or indirectly, to any third party any confidential information of the Company.

R2459-5  04/01/08                                              1

7.  For a period of one year following the termination of Service Provider's employment by Agent, Service Provider agrees not to solicit the purchase of products or services in competition with those sold by the Company:

    1.  With respect to any person, company, or organization to whom Agent, or any person employed by Agent, including Service Provider, sold insurance or other products or services on behalf of the Company, and who is a customer of the Company at the time of the termination; or

    2.  With respect to any person, company, or organization who is a customer of the Company at the time of the termination and whose identity was discovered as a result of access to confidential information of the Company; or

    3.  From any office or business site located within one mile of any locations from which the Agent solicited or sold Company insurance or other products or services during the year immediately preceding the termination.

    In the event that such one year period or one mile distance exceeds the time or distance permitted by any applicable law, such period or distance will be automatically adjusted to the maximum period or distance permitted by such law. If any other provision in this paragraph 7 conflicts with any existing law, it will be applied to the extent permitted by such law.

8.  Upon the termination of Service Provider's employment by Agent, Service Provider will immediately cease and desist from any and all use of Company service marks and trade names. Service Provider will immediately return to the Agent or the Company any property bearing any Company service marks or trade names, or dispose of such materials in the manner specified by the Company. If requested by the Company, Service Provider will execute an Order to Transfer of Responsibility for any telephone numbers in the Service Provider's name, which were used in connection with the conduct of business on behalf of the Company.

9.  While employed by Agent, Service Provider agrees that he/she will not, either directly or indirectly, solicit, sell or service insurance of any kind for any other company, agent or broker, or refer a prospect to another company, agent or broker without the prior written consent of the Company.

10. Service Provider recognizes that a breach by any of the foregoing provisions will cause irreparable damage to the Company's business and that such damages will be difficult or impossible to measure. Service Provider agrees that in the event of any such breach the Company, in addition to such other rights and remedies as it may have, will be entitled to an order granting injunctive relief from any court of competent jurisdiction against any act which would violate any such provision, without the necessity of posting a bond, and Service Provider waives any defense to an application for such order, except that the violation did not occur. Service Provider agrees that the Company will be entitled to an award of reasonable attorney's fees in the event that it is successful in an application for injunctive relief or in an action based upon breach of the foregoing provisions.

11. This agreement supersedes and replaces any prior confidentiality and non-competition agreement between the parties hereto. The parties agree that the use of electronic signatures for the execution of this Agreement shall be legal and binding and shall have the same full force and effect as if originally signed.

IN WITNESS WHEREOF, the parties hereby accept the terms of this Agreement.

Accepted by:

| SERVICE PROVIDER | AGENT | ALLSTATE INSURANCE COMPANY |
|---|---|---|
| (name) | (name) | (authorized representative) |
| (date) | (date) | (date) |

R2459-5  04/01/08                     2

# EXHIBIT 2
### *Termination Letter*



**Allstate.**
You're in good hands.

Eric Stone
District Sales Leader
Central East Zone

May 27, 2021

GV Agency Inc.
Attn: Viorica Stefan Budeanu
1605 Church Street, Suite 610
Decatur, GA 30033-6066

Dear Viorica:

This letter is notice that Allstate Insurance Company is terminating the Allstate R3001C Exclusive Agency Agreement ("Agreement") with GV Agency Inc., ("Agency") effective immediately. The termination is pursuant to Section XVII.B.3 of the Agreement. Allstate is taking this action for reasons that include providing false information to the company.

Agency's obligations to Allstate are stated in the Agreement. The Agreement requires that Agency must, among other things:

- Immediately return all property belonging to Allstate including all manuals, equipment, and any materials bearing any Allstate service mark or trade name;
- Immediately cease to use any telephone numbers used to conduct Allstate business from the former sales location; and
- Immediately cease and desist from any and all use of Allstate service marks and trade names.

Agency may have the option of accepting a termination payment from Allstate or selling the economic interest to an approved buyer as outlined in the Independent Contractor Manual and Supplement for the R3001C Agreement. If Agency is eligible for and elects the termination payment option, Agency will receive such payment calculated and paid in accordance with the Supplement for the R3001C Agreement. Please note the termination payment is conditioned upon, for example, compliance with the confidentiality and non-solicitation provisions that survive the termination of the Agreement and the immediate return of all Allstate property.

If Agency elects to sell the economic interest in the book of business, Allstate has the absolute right of approval of the buyer. The buyer must meet Allstate's eligibility requirements. If Allstate approves a proposed buyer, **the sale must be completed on or before the sale must be completed on or before September 1, 2021** and must be effective on the first day of that or any earlier month. If Agency does not present a buyer or the buyer that Agency presents is not approved, we will process the termination payment as described above.

Confidential Information



**Allstate.**
You're in good hands.

Eric Stone
District Sales Leader
Central East Zone

If agency elects, it may sell its interest in any assigned risk policies it may own. After the Agreement terminates, agency will continue to receive commissions on existing assigned risk policies processed by Allstate that it retains, if any. Also, if agency elects, it may seek to transfer any flood policies it may have produced subject to such rules and policies that are applicable to flood business.

Please contact me with any questions you have regarding the termination process.

Sincerely,

Eric Stone
District Sales Leader
Central East Zone

CC:    2784 N. Decatur Rd. # 100
       Decatur, GA 30033-5903

Confidential Information

# EXHIBIT 3

*Letter from Allstate - May 28, 2021*



**Allstate.**
You're in good hands.

Eric Stone
District Sales Leader
Central East Zone 3

May 28,2021

Viorica Stefan Budeanu
Exclusive Agent

Dear Viorica,

Pursuant to the Agreement, due to the immediate for cause termination of the R3001 Agreement with GV Agency Inc. ("Agency"), the Agency is obligated to repay to the Company the amount or value of any and all Bonus Compensation (i.e. – bonuses, incentives, awards, prizes, and other remuneration based on performance), paid or awarded to the Agency starting with the year in which the incident occurred that led to the termination through the year in which the Company terminated the R3001 Agreement immediately for cause. The Agency is obligated to repay to the Company the amount of $148,449.00 for Bonus Compensation paid, $0.00 for ALR Bonus Compensation paid, and $3,000.00 for Awards paid to you from 2020.

*Please follow the below steps to determine repayment options:*

1. Allstate will first attempt to recover the funds from any remaining compensation payments.
2. Contact COMMPAY to determine any remaining obligation:  COMCOEALL@allstate.com or 1-800-340-0475 option 1,3
3. Any remaining obligation should be paid via electronic transfer of funds to expedite handling.
    a. Provide attached instructions to your bank for proper handling of the electronic transfer of funds.
    b. IMPERATIVE:  Instruct bank to include your name & agent# in memo section to ensure proper crediting.



Bank of New York
AIC 3427.pdf

**Key Points:**

- The preferred method of repayment is electronic transfer of funds.  Checks can be mailed, but may experience significant delays, which could affect a book sale.  Please contact COMCOE above to arrange.
- The Agency has an obligation to reimburse Allstate prior to being granted approval to transfer the economic interest in the Agency's book of business or to receive the Termination Payment, if eligible.  This means:
    c. If the Agency elects to sell the economic interest in the book of business, Allstate will not permit the sale to take place until the obligation has been repaid in full and payment has cleared.
    d. If the Agency is eligible for and elects the Termination Payment, Allstate will deduct any obligation owed from the value of the TPP.  If the economic interest has been assigned to a lender through Allstate Lending Connection, the obligation to Allstate will be satisfied before any payments are made to a bank or lender.
- Any outstanding obligation unremitted to Allstate will be referred to Collections.
- Any questions regarding 1099 concerns should be directed to your tax advisor.
    a. In order to be credited in the current tax year, payment must be cleared by 12/17/2021.

Please contact me at (504) 202-8521 with any questions you have regarding the termination process.

Sincerely,

Eric Stone
District Sales Leader

E-FILED IN OFFICE - JM
CLERK OF SUPERIOR COURT
GWINNETT COUNTY, GEORGIA
22-A-08425-2
9/27/2022 8:12 PM
TIANA P. GARNER, CLERK

**General Civil and Domestic Relations Case Filing Information Form**

☒ Superior or ☐ State Court of  Gwinnett _____ **County**

| For Clerk Use Only | |
|---|---|
| Date Filed _____ | **Case Number**  22-A-08425-2 |
| **MM-DD-YYYY** | _____ |

**Plaintiff(s)** — **Defendant(s)**

| Plaintiff(s) | | | | | Defendant(s) | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Budeanu | Viorica | | | | Allstate | Insurance | Company | | |
| **Last** | **First** | **Middle I.** | **Suffix** | **Prefix** | **Last** | **First** | **Middle I.** | **Suffix** | **Prefix** |
| GV Agency, | Inc. | | | | | | | | |
| **Last** | **First** | **Middle I.** | **Suffix** | **Prefix** | **Last** | **First** | **Middle I.** | **Suffix** | **Prefix** |
| | | | | | | | | | |
| **Last** | **First** | **Middle I.** | **Suffix** | **Prefix** | **Last** | **First** | **Middle I.** | **Suffix** | **Prefix** |
| | | | | | | | | | |
| **Last** | **First** | **Middle I.** | **Suffix** | **Prefix** | **Last** | **First** | **Middle I.** | **Suffix** | **Prefix** |

**Plaintiff's Attorney**  Cary Ichter _____  **State Bar Number** 382515 _____  **Self-Represented** ☐

**Check one case type and one sub-type in the same box (if a sub-type applies):**

| General Civil Cases | Domestic Relations Cases |
|---|---|
| ☐ **Automobile Tort** | ☐ **Adoption** |
| ☐ **Civil Appeal** | ☐ **Contempt** |
| ☐ **Contempt/Modification/Other** |    ☐ **Non-payment of child support,** |
|    **Post-Judgment** |    **medical support, or alimony** |
| ☑ **Contract** | ☐ **Dissolution/Divorce/Separate** |
| ☐ **Garnishment** |    **Maintenance/Alimony** |
| ☐ **General Tort** | ☐ **Family Violence Petition** |
| ☐ **Habeas Corpus** | ☐ **Modification** |
| ☐ **Injunction/Mandamus/Other Writ** |    ☐ **Custody/Parenting Time/Visitation** |
| ☐ **Landlord/Tenant** | ☐ **Paternity/Legitimation** |
| ☐ **Medical Malpractice Tort** | ☐ **Support – IV-D** |
| ☐ **Product Liability Tort** | ☐ **Support – Private (non-IV-D)** |
| ☐ **Real Property** | ☐ **Other Domestic Relations** |
| ☐ **Restraining Petition** | |
| ☐ **Other General Civil** | |

☐   Check if the action is related to another action pending or previously pending in this court involving some or all of the same: parties, subject matter, or factual issues. If so, provide a case number for each.

_____     _____
     **Case Number**                    **Case Number**

☑   I hereby certify that the documents in this filing, including attachments and exhibits, satisfy the requirements for redaction of personal or confidential information in OCGA § 9-11-7.1.

☐   Is a foreign language or sign-language interpreter needed in this case? If so, provide the language(s) required.

_____ **Language(s) Required**

☐   Do you or your client need any disability accommodations? If so, please describe the accommodation request.

Version 1.1.20