IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

VIORICA BUDEANU and GV
AGENCY, INC.,

   Plaintiffs,

v.

ALLSTATE INSURANCE COMPANY,

   Defendant.

CIVIL ACTION FILE

No. 1:22-CV-4413-SCJ

**O R D E R**

This matter is before the Court on Defendant's Motion for Summary

Judgment. Doc. No. [78]. Also pending are four Motions for Leave to File Matters

Under Seal. Doc. Nos. [80]; [91]; [99]; and [104].

As an initial matter, the Motions for Leave to File Matters Under Seal (Doc.

Nos. [80]; [91]; [99]; and [104]) are **GRANTED**.[1]

---

[1] This Order contains quotes and detailed discussions of materials that the Court has allowed to be filed under seal. However, the Court will not redact the Order or alter its discussions based on approval of sealed filings. All information included in this Order

## I.    BACKGROUND

Ordinarily, the Court would derive the factual background from the Rule 56 Statements of Material Facts and the Responses thereto. But in this case, the Parties dispute or object to copious numbers of the Statements proffered by the opposing side. See Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts (Doc. No. [96-1]); Def.'s Resp. to Pl.'s Statement of Additional Material Facts (Doc. No. [105]). After reviewing the Statements and Responses, the Court found that in some instances the cited evidence did not support the proffered statement but nevertheless contained facts relevant to the issues raised in the Motion for Summary Judgment. In other instances, the cited evidence did support the proffered statement, but the facts embodied were immaterial. Therefore, in setting forth this factual background, the Court has drawn primarily from the underlying evidence on the record it found to be material and relied on the Parties' Statements only sparingly.

---

was critical in reaching a decision on Defendant's Motion for Summary Judgment. Therefore, it is necessary to include the information herein and equally necessary for this Court's decision be filed on the open docket.

### A.    Execution of the Agreements

On May 9, 2016, Viorica Budeanu signed the Allstate R3001S Agency Agreement (the "Budeanu Agreement"). Doc. No. [79-2]; Def.'s Statement of Undisputed Material Facts ("DSUMF") ¶ 1 (Doc. No. [78-2]); Pls.' Statement of Additional Material Facts ("PSAMF") ¶ 1 (Doc. No. [96-10]). Allstate did not sign that agreement until June 1, 2016. Maloney Dep. at 160:9–18 (Doc. No. [90-2]). Also on June 1, 2016, Allstate and GV Agency, Inc. ("GV") entered into the Allstate R3001C Exclusive Agency Agreement ("GV Agency Agreement"). Doc. No. [78-5]; PSAMF ¶ 2. Budeanu executed the GV Agency Agreement on behalf of GV. Doc. No. [78-5]. While Allstate's Rule 30(b)(6) deponent testified that according to common practice, the Budeanu Agreement would have been executed prior to the GV Agency Agreement, he indicated that he has no knowledge of which agreement <u>Allstate</u> executed first on June 1, 2016. Maloney Dep. 160:19–161:22 Doc. No. [90-2].

### B.    Pertinent Provisions of the Agreements and Incorporated Documents

The Budeanu Agreement and the GV Agency Agreement (collectively, "the Agreements") expressly state that each "supersedes and replaces any . . .

3

other agreement between the Company and Agency and any of its officers, directors, shareholders, members and employees." GV Agency Agreement § 1.B. (Doc. No. [78-5]); Budeanu Agreement § 1.B (Doc. No. [79-2]).

The GV Agency Agreement provides:

> The relationship between the Company and Agency and its officers, directors, shareholders, members, employees, and other persons working in connection with this Agreement, will be that of an independent contractor for all purposes. Agency will not represent that it has authority to act on behalf of the Company or enter into any contract on behalf of the Company, except contracts of insurance or other contracts expressly authorized by this Agreement.

GV Agency Agreement § I.D (Doc. No. [78-5]). Similarly, the Budeanu Agreement provides:

> You are an independent contractor for all purposes and not an employee of the Company. You will have full control of your time and the right to exercise independent judgment as to the time, place, and manner of performing your duties, which are defined in this Agreement and the incorporated Supplement, EA Manual, and Agency Standards. You will not represent that you have authority to act on behalf of the Company or enter into any contract on behalf of the  Company, except contracts of insurance or other contracts expressly authorized by this Agreement.

Budeanu Agreement § I.D (Doc. No. [79-2]).

The GV Agency Agreement provides:

4

> Agency has an economic interest, as defined in this Agreement and the incorporated Supplement and EA Manual, in its Allstate customer accounts developed under this Agreement. Subject to the terms and conditions set forth in this Agreement and the incorporated Supplement and EA Manual, Agency may transfer its entire economic interest in the business written under this Agreement upon termination of this Agreement by selling the economic interest in the business to an approved buyer. The Company retains the right in its exclusive judgment to approve or disapprove such a transfer. Any failure to disclose and obtain the prior written approval of the Company for any transfer of Agency's interest in this Agreement or any share or interest in Agency shall constitute a breach of this Agreement and cause for termination of this Agreement.

GV Agency Agreement § XVI(B) (Doc. No. [78-5]). Similarly, the Budeanu

Agreement provides:

> You have an economic interest, as defined in this Agreement and the incorporated Supplement and EA Manual, in your Allstate customer accounts developed under this Agreement. Subject to the terms and conditions set forth in this Agreement and the incorporated Supplement and EA Manual, you may transfer your entire economic interest in the business written under this Agreement upon termination of this Agreement by selling the economic interest in the business to an approved buyer. The Company retains the right in its exclusive judgment to approve or disapprove such a transfer. Any failure to disclose and obtain the prior written approval of the Company for any transfer of your interest in this Agreement or any share or interest in Agency shall constitute a breach of this Agreement and cause for termination of this Agreement.

Budeanu Agreement § XVI(B) (Doc. No. [79-2]).

The GV Agency Agreement provides that it may be terminated:

1. At any time by mutual agreement of the parties in writing;

2. By either party, with or without cause, upon providing ninety (90) days prior written notice to the other, or such greater number of days as is required by law. Once written notice of termination has been given by either party, Agency will, immediately upon request of the Company, cease to act or to represent itself in any way as an agent or representative of the Company, but it will receive compensation pursuant to Section XV from the Company for the period up to and including the specified termination date; or

3. Alternatively, by the Company, with cause, immediately upon providing written notice to Agency. Cause may include, but is not limited to, breach of this Agreement, fraud, forgery, misrepresentation or conviction of a crime. The list of examples of cause just stated shall not be construed to exclude any other possible ground as cause for termination.

GV Agency Agreement § XVII(B) (Doc. No. [78-5]). The Budeanu Agreement contains the identical provisions. Budeanu Agreement § XVII(B) (Doc. No. [79-2]).

Both Agreements provide that:

[t]he Supplement for the R3001 Agreement ("Supplement") and the Exclusive Agency Independent Contractor Manual ("EA Manual") and the Allstate Agency Standards ("Agency Standards") as they may be amended from time to time, are expressly incorporated in their entirety as part of this Agreement. The Company reserves the right to amend the Supplement, EA Manual, and Agency Standards at any time without prior notice to Agency except that notice

6

> regarding changes to commission amounts will be given as indicated in Section XV.

GV Agency Agreement § I(C) (Doc. No. [78-5]); Budeanu Agreement § I(C) (Doc.

No. [79-2]).

> The GV Agency Agreement provides that:

> Agency will not, either directly or indirectly, solicit, sell, or service insurance of any kind for any other company, agent, or broker, or refer a prospect to another company, agent, or broker, without prior written approval of the Company. Agency may, however, write applications for insurance under an assigned risk, cooperative industry, or government established residual market plan or facility in accordance with the Company's rules and procedures.

GV Agency Agreement § I(E) (Doc. No. [78-5]). Similarly, the Budeanu

Agreement provides that:

> You will not, either directly or indirectly, solicit, sell, or service insurance of any kind for any other company, agent, or broker, or refer a prospect to another company, agent, or broker, without prior written approval of the Company. You may, however, write applications for insurance under an assigned risk, cooperative industry, or government established residual market plan or facility in accordance with the Company's rules and procedures.

Budeanu Agreement § I(E) (Doc. No. [79-2]).

> The EA Manual contains the following provisions:

7

**Agent Responsibilities**

You are the person ultimately responsible for all sales and service activities of your LSP[2] since he is acting under your direction or control. His representations will be attributed to you. It is your responsibility to be certain that your LSP is fully trained and prepared to represent Allstate well as a professional with the highest integrity.

You must ensure that certain responsibilities are met, including:

- Maintaining a valid insurance license. You are responsible for providing to the Company annual proof that the LSP has a valid license. You must immediately notify the Company if the LSP ceases to work for you or loses his license so Allstate can withdraw sponsorship of the LSP's license. You must also use Manage My Staff (MMS) to verify, add or terminate licensed agency staff.

- Compliance with Company policies and procedures, including the Allstate Agency Standards, and all applicable laws and regulations relating to the conduct of business under the R3001 Agreement

- Providing a proper level of customer service

- Compliance with the standards described under Ethical Standards in the Conduct of Business

- Obtaining accurate and truthful information on all applications

- Meeting all quality verification and administrative requirements

---

[2] The EA Manual defines LSPs as "Licensed Sales Professionals." Doc. No. [79-6], 26.

- Providing the education and development necessary to avoid errors and omissions (E&O) activity. With E&O coverage through CalSurance, your errors and omissions protection is extended to your LSP for authorized sales and service activities. Any errors and omissions situation resulting from the actions of your LSP will be treated just as if it resulted from your own sales and service activities.

  As with any member of your agency staff, the LSP must sign the appropriate Confidentiality and Non-Competition Agreement.

Doc. No. [79-6], 27.

**Ethical Standards in the Conduct of Business**

Allstate has identified and adopted certain ethical standards that govern how it chooses to conduct business.

All agency activities must be consistent with Allstate's ethical standards, and an activity inconsistent with the ethical standards may result in the termination of your agency relationship with the Company.

The following describes ethical standards. Although not all-inclusive, these standards are guides of conduct that you should follow as a representative of the Company. The standards also apply to any member of your agency.

Id. at 44.

**Integrity**

As a Company representative, you are expected to act honestly and fairly in all of the Company's business relationships.

9

You are expected to comply with Company policies and procedure, including the Allstate Agency Standards, and all applicable laws and regulations relating to the conduct of business under the R3001 Agreement.

Second, you may never falsify any state insurance department or Company documents, including applications, and you may never forge signatures. Furthermore, you may never withhold information from the Company that could be considered material to its decision to issue coverage.

Last, misappropriation of funds and cooperating with other to defraud, or any other illegal or criminal acts will not be tolerated.

Id. at 45.

**Unacceptable Sales Practices**

There are certain sales practices that are unacceptable for representatives of the Company, including, but not limited to, the following:

Encouraging Customers to Change Agents  You should act as a professional in your dealings with your fellow agents by not soliciting customers to change agents. We all recognize that there are legitimate cases in which a policyholder makes a request to be transferred to another agent. For example, there are times when some agents and policyholders just can't get along. We have a process in place to handle those situations. However, even though you may need to provide customer service to customers who have another agent, including taking their payments, you should not be encouraging them to seek a transfer to you or any other agent.

<u>Unauthorized Brokering</u>  You may not represent or solicit business for any other company, agent or broker, except as permitted by the Company.

<u>Improper Referrals</u>  You may not accept business which has been referred from an agent, broker, insurance producer, risk manager or any other person if the business will be controlled/serviced by such person.

<u>Rebating</u>  You may not pay, allow or give, directly or indirectly, any rebate, discount reduction of the premium, or any other thing of value to a customer as an inducement to purchase insurance or after it has been purchased, except where permitted by law and authorized by the Company.

<u>Replacing Existing Life Insurance</u> to the Disadvantage of the Policyholder  Replacing existing life insurance may not be in the policyholder's best interest. You may not replace existing life insurance knowing the policyholder would have been better off retaining his existing policy or contract.

<u>Deceptive or Misleading Representations about Competitors</u>  State regulations prohibit verbal or written representations about our competitors that are untrue, deceptive or misleading. These practices violate our Fair Competition Policy and can result in stiff penalties from the regulators, as well as potential legal action by a competitor or unfair competition. All statements on the financial condition, legal status, product performance, or other characteristics of our competition must be factual. Disparaging comments regarding a competitor is a sensitive issue, particularly in potential replacement situations, and are prohibited.

<u>Misclassifying and Misrating</u>  You may not knowingly misrate or misclassify in order to provide a more attractive premium to make a sale.

11

Inappropriate Premium Payment  You may not provide your personal EFT or credit card information for any premium payment(s) on a customer's policy.

In conclusion, here are two important points to remember:

If you ever have questions or doubts about a situation, you should check with the Company.
Allstate may prosecute any criminal acts against the Company.

Id. at 46.

### C.    Standards for Confirming Prior Insurance

When an Allstate agent is writing a policy for a new customer, there is a system that provides information as to whether the potential customer had prior insurance. Adams Dep. at 27:6–8 (Doc. No. [97-1]); Maloney Dep. at 101:13–102:2 (Doc. No. [90-2]). If that system did not return information about prior insurance, the agent would have to manually input what prior insurance the customer had. Adams Dep. at 27:8–12 (Doc. No. [97-1]).

To confirm the existence of prior insurance, the agent needed documentation such as a declarations page or a letter from the prior insurer. Adams Dep. at 27:13–25 (Doc. No. [97-1]); Maloney Dep. at 102:10–103:13 (Doc. No. [90-2]). The agent was then required to upload the documentation into

12

Allstate's eAgent system. Adams Dep at 28:7–14 (Doc. No. [97-1]). However, an agent taking in new business was not required to call a potential customer's prior insurer to confirm coverage. Maloney Dep. at 119:7–10 (Doc. No. [90-2]); Adams Dep. at 31:18–32:5 (Doc. No. [97-1]). In fact, it was typical that Geico would not provide information about its prior insureds over the phone. Adams Dep. at 63:12–24 (Doc. No. [97-1]). Furthermore, Geico did not allow third parties to use its website to verify details of an insured. Adams Dep. at 56:8–57:2; 72:24–73:3 (Doc. No. [97-1]). However, some insurance companies would provide online access regarding prior coverage. Adams Dep. at 56:1–7 (Doc. No. [97-1]).

Allstate had no policy requiring an Exclusive Agent to make a determination of whether a customer-provided declarations page of prior coverage was authentic. Adams Dep. at 81:25–82:4. (Doc. No. [97-1]). Allstate had no written requirement that an Exclusive Agent conduct an online search to verify that a prospective customer had prior continuous insurance. Adams Dep. at 32:14–18 (Doc. No. [97-1]).

If a customer had no prior insurance coverage, it is possible that the customer would not qualify for an Allstate policy. Adams Dep. at 35:3–9 (Doc. No. [97-1]). In some instances, a customer lacking continuous prior coverage

13

could qualify for coverage but at a higher premium. Adams Dep. 37:16–38:15 (Doc. No. [97-1]).

### D.     Audit of GV's New Business November 2020 through Dec. 2020

Lara Adams is a Compliance Consultant II with Allstate's Field Business Compliance ("FBC") department. Adams Dep. 14:13–16 (Doc. No. [97-1]). Between the years 2016 and 2021, Adams's job duties included the auditing of an Exclusive Agent's remittance process, the application of discounts, and even, at times, policies in their entirety. Id. at 18:6–21. A typical audit included review of around 20 policies. Id. at 26:7–15.

Adams received her assignments monthly from her manager; she was not involved in selecting which agents and policies she audited. Id. at 19:1–14. But Adams was aware that Allstate had a quality control procedure that resulted in the auditing of agents who attained a certain level of business activity. Id. at 20:7–21:5. According to Allstate's Rule 30(b)(6) witness, the audit of GV Agency conducted by Adams was random. Maloney Dep. at 90:17–92:13 (Doc. No. [90-2]).

Adams was assigned to audit the GV Agency policies written between November 1, 2020 and December 31, 2020. Adams Dep. 22:16–19; 40:22–41:3;

14

42:4–19 (Doc. No. [97-1]). More specifically, she reviewed new business generated by the GV Agency during that time-period. Id. at 43:20–44:8. She did not speak to Budeanu or any employee of the GV Agency. Id. at 46: 25–47:6.

Over the course of the audit, Adams identified four policies with potential alterations related to prior insurance coverage. Doc. No. [79-8]. In the first, a declarations page for prior insurance of customer Hamza Amir, Adams determined that the font for the insured's name and address appeared different than the font of the rest of the document. Adams Dep. at 48:7–50:21 (Doc. No. [97-1]). On that same page, she noted a discrepancy underneath the agent's name. Id. at 51:1-7. Adams called the agent listed on Amir's prior insurance declarations page and was told that the agent did not have a prior customer by that name. Id. at 51:18–23; 52:24–53:2.

Next, Adams flagged the insurance ID card and declarations page of customer Ariel Coppola. Id. at 59:5–7; 61:20–62:3. Again, Adams found the appearance of differing fonts on these documents. Id. at 63:1–4. She also noted that the name and address field seemed smaller than other parts of the documents. Id. at 63:5–11. The prior insurer was Geico, and Adams was unable

15

to gain any information verbally or online from Geico; she did not attempt to contact Coppola. Id. at 63:12–64:7.

The third policy noted by Adams was for customer Roland Butuc. Id. at 64:15–65:13. Adams believe the declarations page for Butuc's prior insurance appeared altered because the font for the insured's name and address appeared different than the rest of the document. Id. at 65:22–66:9. She further noted that the heading of the page said "Owners" instead of "Auto-Owners." Id. at 66:10–19. And she noted that the numbers in the time stamp appeared different than the numbers in the date stamp. Id. at 66:22–67:2. Finally, she pointed out instances where lines did not appear uniform. Id. at 67:11–15. Adams could not recall whether she attempted to contact the agency or insurance companies to confirm the purported prior insurance for Butuc. Id. at 68:10–16. Adams made no effort to contact Butuc to confirm whether the documents accurately reflected his prior insurance. Id. at 71:1–3.

The forth policy identified by Adams was for customer Anil Kumar; the Geico declarations page for his prior insurance appeared to contain an address in which one line was a space off. Id. at 71:10–72:11. Adams also pointed out instances of dotted lines on the document. Id. at 72:12–16. Adams does not recall

16

whether she tried to confirm the prior insurance with Geico, either by phone or online, but thought it unlikely that she would have gotten confirmation due to Geico's refusal to give out such information. Id. at 72:17–73:3. Adams made no effort to contact Kumar to confirm whether the document accurately reflected his prior insurance. Id. at 73:4–5.

Adams said that following an audit she completed a document containing her findings. Id. at 73:12–74:2 In instances when those findings warranted further investigation, she would refer the matter to corporate security. Id. at 74:3–14.

Adams is not a member of any organization of experts for detecting fraudulent or forged documents. Id. at 81:4–24. Allstate provides no formal training to its auditors and investigators in how to identify fraudulent documents. Maloney Dep. at 119:2–6. (Doc. No. [90-2]).

When deposed in this civil action, Adams acknowledged that the format of a declarations page for an insurance policy can change from time to time. Adams Dep. at 75:23–58:3 (Doc. No. [97-1]). She further recognized that two Allstate documents, a Commission Payment Notification and Budeanu's termination letter, have characteristics such as differing fonts and awkward spacing that are similar to those she flagged throughout the new business audit

17

of GV Agency. Id. at 79:6–81:3; Exs. 4, 5, 12 to Ogunsola Dec. Doc. No. [96-17], 30, 33, 69.

Following the audit of GV Agency's new business from November and December 2020, Adams issued a report  finding that four polices contained indicators of alterations. Doc. No. [79-8]. Adams concluded that the four identified customers may not have qualified for the policy GV Agency wrote or the rate the customer received. Id.

### E.      Additional Investigation and Results

Following Adams's audit, Allstate initiated an investigation into whether Budeanu breached her "R3001 Exclusive Agency Agreement." Doc. No. [79-9], 1. Adams was not involved in the additional investigation. Adams Dep. 23:9–23 (Doc. No. [97-1).

In 2020 and 2021, Allstate had no written policy setting out steps an investigative team had to take to determine whether a submitted document was fraudulent. Maloney Dep. at 104:15–22 (Doc. No. [90-2]). Allstate investigates the authenticity of documents on a case-by-case basis when the need arises. Interog. Resp. 9, Doc. No. [96-17], 41.

18

The investigation included a March 3, 2021 interview of Adams. Adams Dep. at 24:9–21 (Doc. No. [97-1]). It also included a March 12, 2021 interview of Budeanu who was asked about the four documents that were alleged to have been falsified. Budeanu Interview Doc. No. [98]. Budeanu refused to agree that the prior insurance documents she was shown contained discrepancies. Budeanu Interview at 0:59:30–1:08:55. Budeanu continued to ask for documents to compare with what she was shown. Id. In addition, Budeanu complained about computer problems and non-responsive technical support at Allstate that she says resulted in her employees using her Bind ID. Budeanu Interview at 2:30–4:10.

The investigation also included an interview of GV Agency employee, Pamela Rucker. Rucker Interview Doc. No. [98]. When Rucker was shown the documents that were alleged to have been falsified, she was able to see the distinctions pointed out in some instances but not in others. Rucker Interview at 28:50–38:00.

Finally, the interviewer talked with Customer Hamza Amir. Amir Interview. Doc. No. [98]. Amir denied ever having insurance with Mercury Insurance. Id. He stated that he had prior insurance with Progressive Insurance. Id.

19

Ultimately, the investigation found that the "weight of the evidence" was sufficient to conclude that Budeanu falsified four automobile policies by submitting altered proof of prior insurance documentation to qualify customers for coverage. Summary of Evidence, Doc. No. [79-9], 6. The investigation further found Budeanu's denials of wrongdoing to lack credibility. Id.

The decision to terminate an agency agreement rests with the zone leader. Maloney Dep. 106:15–22 (Doc. No. [90-2]). According to Allstate's Rule 30(b)(6) witness, a single instance of fraud by an agent provides authority to terminate an agreement. Id. at 106:4–11. There are other avenues of response by Allstate; for example, an agent who was found to have falsified a homeowners policy document to gain the customer a better rate was coached rather than terminated. Id. at 110:1–113:5

### F.    Plaintiffs' Superiors within Allstate

Eric Stone was Plaintiffs' District Sales Leader ("DSL"), and Karren Thompson was Plaintiffs' Sales Market Leader ("SML"). DSUMF ¶ 23. Stone testified that while he was generally aware that Allstate would conduct audits, he had little specific knowledge of the audit process. Stone Dep. at 23:2–26:5 (Doc. No. [90-4]). As to the decision to terminate the GV Agency Agreement,  Stone

20

testified he was on board even if only one of four of the purported prior insurers was contacted during the investigation of the four allegedly falsified documents. Id. at 90:21–91:1. Thompson testified that she was not involved in the decision to audit or investigate GV Agency or with the audit and investigation that took place. Thompson Dep. 108:20–22 (Doc. No. [90-3]).

On April 27, 2021, John Sanders, Senior Manager of Investigative Services for Allstate, sent an email to Karen Sullivan, the zone leader for the sales force in the central east zone (encompassing GV Agency), attaching the Summary of Evidence from the investigation. Sullivan Dep. at 14:23–15:8 (Doc. No. [90-1]). While Sanders did not include any recommendation in his email, the attached Summary of Evidence concludes that the weight of the evidence supports termination of "Budeanu's R3001 Exclusive Agency Agreement." Doc. No. [79-9], 6. Sullivan was the final decision maker in her zone on whether to terminate an agency agreement. Sullivan Dep. at 39:19–22 (Doc. No. [90-1]).

Sullivan was made aware of the ongoing investigation of Budeanu via an email dated February 28, 2021. Id. at 47:3–9; 47:13–48:11. In deciding whether to terminate the GV Agency and Budeanu's agreements, Sullivan reviewed the Summary of Evidence. Id. at 52:3–13. She did not review the four policies that

21

were alleged to contain altered documents. Id. at 53:9–54:1. She did not review the recorded interviews that were referenced in the Summary of Evidence. Id. at 54:11–14; 55:15–20; 56:4–7; 56:17–20. Sullivan reviewed the Summary of Evidence with Stone. Id. at 60:2–21. Then Sullivan responded to Sanders, asking for clarification on the efforts to contact the purported prior insurers to confirm the prior coverage. Id. at 64:17–65:16. Sanders responded, indicating that he did not believe the other insurance companies needed to be called. Id. at 66:9–12. After that response from Sanders, Sullivan expressed her satisfaction with contacting only one of the four purported prior insurers. Id. at 66:13–24.

### G.    Plaintiffs' Effort to Purchase A New Book of Business

Meanwhile, Budeanu was seeking to purchase the book of business of Allstate Exclusive Agent Daniel White. DSUMF ¶ 33. On April 30, 2021, Stone told Budeanu that she was "good to go talk with agencies" and "eligible for discussion on satellites." Id. at ¶ 32. Allstate's Rule 30(b)(6) witness explained that eligibility does not equate to approval. Maloney Dep. at 139:21–5 (Doc. No. [90-2]).

Budeanu testified that though she met all the criteria to purchase White's agency, Thompson avoided meeting with her to begin the process of the

purchase. Budeanu Dep. at 53:15–54:18 (Doc. No. [93-1]). White testified that he was encouraged by Thompson to sell to an outside purchaser rather than to an existing Allstate agent. White Dep. at 23:7–16 (Doc. No. [94-1]). Allstate never approved Budeanu's purchase of White's economic interest. DSUMF ¶ 34. Ultimately, White learned from Budeanu that she would not be able to purchase his agency after Allstate terminated the GV Agency Agreement and the Budeanu Agreement. DSUMF ¶ 39.

### H.    Communication of Termination

A letter from Stone addressed to GV Agency Inc. at 1605 Church St., Suite 610, Decatur, GA 30033-6066 and dated May 26, 2021 states that Allstate was terminating the GV Agency Agreement. Doc. No. [79-14]. Also on May 26, 2021, Stone held a conference with Budeanu during which he told her that the GV Agency Agreement was being terminated. DSUMF ¶ 29. At 3:02 p.m. on May 26, 2021, Stone sent an email Budeanu at her Allstate email address with the termination letter attached. Id. ¶ 30. The letter also shows that a courtesy copy of the letter was mailed to 2784 N. Decatur Rd. #100, Decatur, GA 30033-5903. Doc. No. [79-14], 3. According to Budeanu's testimony, she never received the Allstate termination letter. Budeanu Dep. 187:20–23 (Doc. No. [93-1]). Budeanu further

23

explained that the N. Decatur Rd. address was an old address for her prior residence that she left in March 2019. Id. at 185:1–8. Budeanu testified that she utilized Allstate's platforms to change her personal address within 20 days of her move. Id. at 187:17–20. As for the mail at the office address, Budeanu testified that pursuant to Allstate's instructions, she forwarded the mail from the Church St. address immediately upon the learning that the GV Agency Agreement was terminated. Id. at 208:5–17. With respect to email, generally, a terminated Allstate agent would immediately lose access to the Allstate system including email. Maloney Dep. at 126:11–25 (Doc. No. [90-2]).

### I.    Post-termination

Budeanu sent an email to Glenn Shapiro, President of Property Liability, dated June 24, 2021 complaining about her treatment by Allstate during the years she was an Exclusive Agent; therein, she describes ongoing problems her agency experienced with Allstate computer programs that resulted in her employees being required to use her bind ID. Ex. 15 to Ogunsola Dec. (Doc. No. [96-17], 92–97); Maloney Dep. at 31:12–15 (Doc. No. [90-2]).

Ultimately, Budeanu's brother, Mike Gopsha was approved to purchase her book of business. Maloney Dep. at 133:7–22 (Doc. No. [90-2]). Ordinarily, a

24

family member would not qualify to buy a departing agent's book of business. Stone Dep. at 112:11–113:14 (Doc. No. [90-4]). However, because many of GV Agency's customers were Russian or Romanian speaking, Allstate's Customer Contact Center could not communicate with them. Id. Therefore, an exception was made. Id.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides "[t]he court shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. A factual dispute is genuine if the evidence is such that a reasonable jury may return a verdict for the non-moving party. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). A fact is "material" if it is "a legal element of the claim under the applicable substantive law which might affect the outcome of a case." Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997) (citing Anderson, 477 U.S. at 248). In essence, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251–52.

25

The moving party bears the initial burden of showing the court, by reference to materials in the record, that there is no genuine dispute as to any material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 1997) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). The moving party may discharge their burden by "showing — that is, pointing out to the district court — that there is an absence of evidence to support [an essential element of] the nonmoving party's case." Celotex Corp., 477 U.S. at 325. In determining whether the moving party has met this burden, the district court must view the evidence and all factual inferences in the light most favorable to the nonmoving party. Johnson v. Clifton, 74 F.3d 1087, 1090 (11th Cir. 1996) (citing Augusta Iron & Steel Works, Inc. v. Emps. Ins. Of Wausau, 835 F.2d 855, 856 (11th Cir. 1988)).

Once the moving party has adequately supported its motion, the non-movant then has the burden of showing that summary judgment is improper by coming forward with specific facts showing that there is a genuine issue for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The court should resolve all reasonable doubts in the non-movant's favor. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). In addition, the court must

26

"avoid weighing conflicting evidence or making credibility determinations." Stewart v. Booker T. Washington, Ins., 232 F.3d 844, 848 (11th Cir. 2000) (citing Damon v. Fleming Supermarkets of Florida, Inc., 196 F.3d 1354, 1361 (11th Cir. 1999), cert denied 529 U.S. 1109 (2000). When the record as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine dispute for trial. Matsushita Elec. Indus. Co., 475 U.S. at 587 (citing First Nat. Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 289 (1968)).

### III.   ANALYSIS

#### A.   Claims Brought under the Budeanu Agreement

Defendant argues that it is entitled to summary judgment as to Plaintiffs' claims brought under the Budeanu Agreement (Counts I, III, and V) because that agreement was superseded by the GV Agency Agreement. Doc. No. [79], 8–9. In response, Plaintiffs argue that there remains a question of fact as to which agreement Allstate executed first. Doc. No. [96], 5.

Allstate asserts that "Matthew Maloney, Allstate's District Sales Leader for the State of Georgia, testified unequivocally that the GV Agency Agreement was executed last . . . ." Doc. No. [103], 2 n.2. This is a mischaracterization of Maloney's testimony. While Maloney stated that Allstate executed the Budeanu Agreement

27

before the GV Agency Agreement (both on June 1, 2016), he admitted that the only basis he has for this conclusion is that "common practice [is] that an agency owner would sign as an individual first in training, and then change their affiliation to a corporation." Maloney Dep. at 160:19–22; 161:1–22. This common practice does not address the question at issue here. It is undisputed that Budeanu signed the Budeanu Agreement on May 9, 2016. PSAMF ¶ 1. To determine whether the Budeanu Agreement was superseded by the GV Agency Agreement, the relevant question is when <u>Allstate</u> signed each Agreement. The Parties agree that Allstate signed both agreements on June 1, 2016, but Maloney admitted that other than the "common practice" he described, he has no knowledge of which of the agreements was signed first. Maloney Dep. at 161:18–22 (Doc. No. [90-2]). Maloney's explanation of Allstate's common practice does not shed light on which agreement <u>Allstate</u> signed first. Accordingly, there remains a question of fact as to whether the Budeanu Agreement was superseded by the GV Agency Agreement.

**B.      Breach of Contract Claims: Wrongful Termination (Counts I & II)**

Defendant argues that regardless of whether the Budeanu Agreement is superseded by the GV Agency Agreement it is entitled to summary judgment as

to Plaintiffs' claims breach of contract based on wrongful termination because the agreements each contained a for-cause termination provision and there was cause to terminate the agreements. Doc. No. [79], 10. In response, Plaintiffs contend that there is a question of fact as to whether Allstate had cause to terminate the agreements. Doc. No. [96], 6. More specifically, Plaintiffs argue that there is "significant evidence" that undermines Allstate's conclusion that Budeanu or GV Agency falsified documents. Doc. No. [96], 6. Therefore, it appears Plaintiffs do not dispute that falsification of prior insurance documentation would constitute cause for Allstate to terminate an agency agreement. What Plaintiffs dispute is whether Allstate had a sufficient basis to conclude that Budeanu or GV Agency falsified any of the four documents at issue.

According to Allstate's Motion for Summary Judgment, the existence of the for-cause provision in the agreements leaves only the question of whether there is evidence that it failed to exercise good faith in determining that "cause" existed. Doc. No. [79], 10 (citing Ossman v. Meredith Corp., No. 1:19-CV-3200-SDG-JKL, 2022 WL 1134724, *24 (N.D. Ga. Jan. 7, 2022)). The Ossman case involved an agreement that expressly gave the defendant discretion to determine

29

whether cause for termination existed. Id. There is no express grant of discretion to determine cause in the Budeanu Agreement or the GV Agency Agreement. In its reply brief, Allstate relies on a provision within both agreements that gives Allstate the "sole discretion" to determine "all matters relating to its business and the operation of the Company including but not limited to . . . [t]he termination or modification of any contract or the refusal to renew any contract." GV Agency Agreement § I(F)(3) (Doc. No. [78-5]); Budeanu Agreement § I(F)(3) (Doc. No. [79-2]). Reading these clauses in context, however, it is clear that the contracts Allstate is afforded the discretion to terminate are contracts for insurance—not the Agreements themselves. Therefore, the good faith standard announced in Ossman does not apply to the Agreements at issue in this case.

Therefore, the Court must consider whether Defendant is correct that Plaintiffs have failed to "point to any evidence to refute Allstate's conclusion that the GV Agency submitted false information to Allstate by manipulating customers' prior insurance coverage information." Doc. No. [79], 16. In response, Plaintiffs point to the following evidence. Doc. No. [96], 7–10.

- Allstate did not require an Exclusive Agent to call a potential customer's prior insurer. Maloney Dep. at 119:7–10 (Doc. No. [90-2]; Adams Dep. at 31:18–32:5 (Doc. No. [97-1]).

30

- Typically, Geico will not provide information about its insureds over the phone. Adams Dep. at 63:12–24 (Doc. No. [97-1]).

- Allstate had no policy requiring an Exclusive Agent to make a determination of whether a customer-provided declarations page was authentic. Id. at 81:25–82:4.

- Allstate had no written requirement that an Exclusive Agent conduct an online search to verify that a prospective customer had prior continuous insurance. Id. at 32:14–18.

- In 2020 and 2021, Allstate had no written policy setting out steps an investigative team had to take to determine whether a submitted document was fraudulent. Maloney Dep. at 104:15–22 (Doc. No. [90-2]).

- Allstate investigates the authenticity of documents on a case-by-case basis when the need arises. Interog. Resp. 9, Doc. No. [96-17], 41.

- Laura Adams is not a member of any organization of experts for detecting fraudulent or forged documents. Adams Dep. at 81:4–24 (Doc. No. [97-1]).

- Allstate provides no formal training to its auditors and investigators in how to identify fraudulent documents. Maloney Dep. at 119:2–6 (Doc. No. [90-2]).

- During her deposition, Adams recognized that two Allstate documents, a Commission Payment Notification and Budeanu's termination letter, have characteristics such as differing fonts and awkward spacing similar to items Adams flagged in the new business audit of GV Agency. Adams Dep. at 79:6–81:3 (Doc. No. [97-1]); Exs. 4, 5, 12 to Ogunsola Dec. Doc. No. [96-17], 30, 33, 69.

31

- Adams acknowledged that the format of a declarations page for an insurance policy can change from time to time. Adams Dep. at 75:23–58:3 (Doc. No. [97-1]).

- During the audit, Adams contacted only one prior insurer via telephone. Id. at 51:18–52:5.

- Adams testified that Geico did not allow third parties to use its website to verify details of an insured. Id. at 56:8–57:2; 72:24–73:3.

- Stone testified that even if only one of four of the prior insurers was contacted during the investigation, he was aligned with the decision to terminate Plaintiffs' agreements. Stone Dep. at 90:21–91:1 ([Doc. No. [90-4]).

- When Budeanu was interviewed as part of Allstate's investigation, she refused to agree with the interviewer, Stacy Strum, that the prior insurance documents she was shown contained discrepancies. Budeanu Interview at 0:59:30–1:08:55 (Doc. No. [98]).

- During the interview, Budeanu continued to ask for documents to compare with what she was shown. Id.

- When Pamela Rucker, an employee of GV Agency, was shown the documents that were identified with discrepancies, she was able to see the distinctions pointed out by the interviewer in some cases and not in others. Rucker Interview at 28:50–38:00 (Doc. No. [98]).

- Budeanu sent an email to Glenn Shapiro dated June 24, 2021 complaining about her treatment by Allstate during the years she was an Exclusive Agent; therein, she describes ongoing problems her agency experienced with Allstate computer programs that resulted in her employees being required to use her bind ID. Ex. 15 to Ogunsola Dec. Doc. No. [96-17], 92–97.

32

- During her March 12, 2021 interview, Budeanu complained about computer problems and non-responsive technical support at Allstate that she says resulted in her employees using her Bind ID. Budeanu Interview at 2:30–4:10 (Doc. No. [98]).

The Court concludes that there is evidence sufficient to create a question of fact on the issue of whether Allstate was correct in its conclusion that Budeanu or GV Agency submitted false information. In fact, Allstate's investigation did not include any effort to establish whether three of the four potential customers had the prior insurance purported by the questioned documents. It is true that customer Hamza Amir denied having Mercury Insurance and the agent for Mercury had no record of a customer by that name. These facts point to a conclusion that the Mercury Insurance declarations page for Amir was altered. But little to no investigation of who altered the document was done by Allstate. Moreover, Amir stated that he had prior insurance with Progressive—a fact Allstate did not confirm. This begs the question of what motive Budeanu would have in creating a false declarations page if the potential customer had qualifying prior coverage. In sum, Allstate's investigation did not conclusively establish that Budeanu falsified any documents. Therefore, Allstate is not entitled to summary

33

judgment as to the breach of contract claims asserting wrongful termination (Counts I and II).

### C.    Breach of Contract Claims: Interference (Counts III & IV)

Counts III and IV allege that Allstate breached the agreements by interfering with Plaintiffs' negotiations with White to buy his book of business. Am. Compl. ¶ 121 (Doc. No. [31]). Allstate moves for summary judgment on these claims, arguing that Budeanu testified that Plaintiffs are not seeking damages related to the efforts to purchase White's book of business. Additionally, Defendant argues that even though Budeanu and GV Agency were under investigation, no decision to terminate their agreements had been made when Stone told Budeanu that she was eligible to discussion purchase of an additional book of business. Finally, Defendant argues there is no evidence of any interference with the Plaintiffs' negotiations with White.

In response, Plaintiffs argue that Defendant has misconstrued Budeanu's testimony regarding damages. Doc. No. [96], 16. Also, Plaintiffs point to White's conversation with Thompson in which she encouraged him to sell to an outside purchaser rather than an existing Allstate agent. Id.

34

With respect to Defendant's contention that Budeanu testified that she is not seeking damages related to the alleged interference with negotiations with White, Defendant is incorrect. Budeanu clarified that the dollar figure contained in paragraphs 90 and 91 of her Amended Complaint and its reference to the repayment of a loan she took out to buy White's book of business resulted from a misunderstanding between her and her counsel. Budeanu Dep. at 201:5–204:2 (Doc. No. [93-1]). However, Budeanu never disclaimed any damage stemming from the alleged interference. She simply explained that the allegations that she had to repay a loan she took out to buy White's business were factually incorrect. Id.

In response to Defendant's argument that there is an absence of evidence of interference, Plaintiffs point to White's testimony in which he (1) says that it was common knowledge that Allstate would not approve sales to existing EAs and (2) describes a conversation with Thompson in which she encouraged him to sell to an outside buyer. Doc. No. [96], 16.

The evidence relied upon by Plaintiffs does not support their breach of contract claims. The terms of both the GV Agency Agreement and the Budeanu Agreement as well as the incorporated EA Manual pertain to the sale of an

35

economic interest, not the purchase thereof. See GV Agency Agreement § XVI (Doc. No. [78-5]); Budeanu Agreement § XVI (Doc. No. [79-2]); EA Manual, 39–40 (Doc. No. [79-6]). Here, Plaintiffs were not attempting to sell their economic interest; they were seeking to purchase the economic interest of another Allstate agent. There is simply no contractual term related to Plaintiffs' efforts to purchase a book of business. Therefore, the evidence adduced by Plaintiffs does not create a question of fact regarding a breach of contract by interference with the White purchase. Defendant is entitled to summary judgment as to Counts III and IV.

### D.   Breach of Implied Duty of Good Faith & Fair Dealing (Counts V & VI)

In Counts V and VI, Plaintiffs allege that Defendant, in exercising its discretion to terminate the agreements for cause, failed to exercise good faith and fair dealing. Am. Compl. at 29–33 (Doc. No. [31]). Defendant moves for summary judgment on these claims, arguing that for the same reasons it is entitled to summary judgment on the wrongful termination claims, it is likewise entitled to summary judgment on the breach of good faith and fair dealing claims. Doc. No. [79], 18–19. As set forth above, however, there remains a question of fact regarding Plaintiffs' breach of contract claims alleging wrongful termination. See

36

supra. Part III.B. Therefore, Defendants is not entitled to summary judgment on the claims for breach of good faith and fair dealing.

### E.    Breach of Fiduciary Duty (Count VII)

In Count VII of the Amended Complaint, Plaintiffs claim that by (1) initiating the investigation of GV Agency's new business, (2) refusing to consider Plaintiffs' requests to purchase other books of business, (3) interfering with Plaintiffs' effort to purchase Whites book of business, and (4) terminating the agreements for arbitrary and capricious reasons, Defendant breached its fiduciary duties to Plaintiffs. Am. Compl. ¶ 162 (Doc. No. [31]). Defendant moves for summary judgment on Plaintiffs' breach of fiduciary duty claim, arguing that it owed no fiduciary duty to Budeanu or GV Agency. Doc. No. [79], 20.

In response to the Motion for Summary Judgment, Plaintiffs argue that Georgia law establishes that the existence of a fiduciary duty is a factual matter for a jury to decide. Doc. No. [96], 18. While this is a general principle of Georgia law, it is inapplicable here because Allstate's argument on the existence of a fiduciary duty is a purely legal one. There is no factual question for a jury to consider.

37

Under Georgia law, an agent has a fiduciary duty to his principal. Wright v. Apartment Inv. & Mgmt. Co., 315 Ga. App. 587, 592, 726 S.E.2d 779, 786 (2012) (citing Nilan's Alley v. Ginsburg, 208 Ga. App. 145(1), 430 S.E.2d 368 (1993)). Because it is undisputed that Budeanu and GV Agency were agents of Allstate, Plaintiffs owed a fiduciary duty to Allstate. However, the question raised in Defendant's Motion for Summary Judgment is whether Allstate owed a fiduciary duty to Plaintiffs.

Plaintiffs cite cases where courts have recognized that a fiduciary relationship arises between a principal and agent. Id. at 19–20. Again, Plaintiffs have correctly cited a general principle of Georgia law. Plaintiffs have not, however, cited any cases in which a court found that a fiduciary duty was owed to the agent by the principal.

According to the Restatement (Third) of Agency, in the principal-agent context, it is the agent who owes a fiduciary duty to the principal as a matter of law. "An agent has a fiduciary duty to act loyally for the principal's benefit in all matters connected with the agency relationship." Restatement (Third) of Agency § 8.01 (2006). Of course, a principal does owe some duties to an agent. Id. at

38

§ 8.138.15. However, the "obligations that a principal owes an agent, specified in §§ 8.13–8.15, are not fiduciary." Id. at § 1.01 cmt. E.

Moreover, it is only when one party assumes and exercises virtually complete and absolute control over all aspects of another party's business as it relates to the transaction, do courts hold that a fiduciary duty will arise. Capital Ford Truck Sales v. Ford Motor Co., 819 F.Supp. 1555, at 1579–80 (citing In re N & D Properties, Inc., 799 F.2d 726, 732 (11th Cir. 1986) and holding that franchisee offered no evidence that franchisor exercised absolute control over franchisee's day-to-day operations necessary to suggest the type of control required to impute a fiduciary duty). Here, Plaintiffs have adduced no evidence that Allstate exercised control over their day-to-day operations such that a fiduciary duty was owed by the principal as opposed to the agent.

Plaintiffs have failed to establish that Defendant owed them a fiduciary duty. Therefore, Defendant is entitled to judgment as a matter of law as to Plaintiffs' breach of fiduciary duty claim.

### F.    Fraudulent Misrepresentation (Count VIII)

In Count VIII of the Amended Complaint, Plaintiffs allege that Defendant, through Stone, told Budeanu that she was eligible to begin negotiations on

purchasing an additional book of business without informing her that she remained under investigation and knowing that Allstate would never approve Plaintiffs' purchase of another agent's economic interest. Am. Compl. ¶¶ 169, 171 (Doc. No. [31]). Defendant has moved for summary judgment, arguing that there is no evidence that Allstate made representations that it knew was false or that Plaintiffs relied on such representations. Doc. No. [79], 22.

In response, Plaintiffs simply rehash their factual allegations of Stone's interactions with Budeanu. Doc. No. [96], 22–23. But there is no evidence cited that would tend to show that any communication Stone had with Plaintiffs was false. Furthermore, Plaintiffs argue that Allstate had a duty to disclose information due to the fiduciary nature of its relationship with Plaintiffs. Doc. No. [96], 23. However, as set forth above, there is no fiduciary duty on the part of Allstate.

Plaintiffs do cite authority for the proposition that "misrepresentation of a material fact 'can be demonstrated by either showing that a material fact was, in fact, misrepresented, or that a material fact was concealed.'" Doc. No. [96], 22 (citing Hubbard v. Stewart, 651 F. Supp. 294, 298 (M.D. Ga. 1987)). In this case, Plaintiffs allege that Stone informed Budeanu that she could move forward with

40

negotiations on buying a book of business while concealing the fact that the investigation resulted in a recommendation of termination. Am. Compl. at ¶ 169 (Doc. No. [31]). It is undisputed, however, that at the time Stone told Budeanu to proceed with negotiations on April 30, 2021, no final decision had been made on the termination of the agreements because Stone and Sullivan had additional questions about the investigation as communicated by a May 10, 2021 email. Sullivan Dep. at 64:17–65:16 (Doc. No. [90-1]); DSUMF ¶ 32. On April 30, 2021, Stone told Budeanu that she was "good to go talk with agencies" and "eligible for discussion on satellites." Id. at ¶ 32.

Finally, Plaintiffs argue that after the decision to terminate the agency agreements was made, Stone assisted them in hiring new agents. Doc. No. [96], 23. A review of the email Budeanu sent to Stone on May 21, 2021 indicates that that she had hired and was paying a new employee, but, because of technical issues, she was having difficulty getting the new employee into the Allstate system such that she could perform work. Stone Dep. at 71:13–23 (Doc. No. [90-4]). In response, Stone said that he would check with another group about fixing the technical issue. Id. at 72:5–10. Thus, the evidence does not support Plaintiffs' characterization that Stone was assisting them in onboarding new employees. In

41

short, there is simply no misrepresentation of a material fact implicated in this exchange.

Because there is no evidence that Defendant made representations it knew were false to Plaintiffs, Defendant is entitled to summary judgment as to Count VIII of the Amended Complaint.

**[SIGNATURE ON FOLLOWING PAGE]**

42

## IV.   CONCLUSION

Based on the foregoing, the Defendant's Motion for Summary Judgment (Doc. No. [78]) is **GRANTED IN PART** and **DENIED IN PART**. The Motion is **GRANTED** as to Counts III, IV, VII, and VIII; it is otherwise **DENIED**.

The Motions for Leave to File Matters Under Seal (Doc. Nos. [80]; [91]; [99]; and [104]) are **GRANTED**; the Clerk is **DIRECTED** to permanently seal the following docket entries: Doc. Nos. [79]; [79-1] through [79-19]; Doc. Nos. [90]; [90-1]; [90-2]; Doc. Nos. [96]; [96-1] through [96-19]; Doc. Nos. [97] ; [97-1]; Doc. No. [98]; Doc. Nos. [103] and [103-1].

The Parties shall file their Consolidated Proposed Pretrial Order within 30 days of the date of this Order.

**IT IS SO ORDERED** this ___4th___ day of July, 2025.

_____
HONORABLE STEVE C. JONES
**United States District Judge**

43